Shirley **BROWN** and Dorothy Black and Almetta Ivey, **individually and on behalf of all others similarly situated, Appellees,**

v.

**ECKERD DRUGS, INC., a corporation now merged with Jack Eckerd Corporation, a corporation and Eckerd's Providence, Inc. (Store # 4), a wholly-owned subsidiary of Eckerd Drugs, Inc., now merged with Jack Eckerd Corporation, Appellants.**

No. 79–1821.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 11, 1980.

Decided Oct. 21, 1981.

Opinion on Denial of Rehearing and Rehearing En Banc Dec. 16, 1981.

See 669 F.2d 913.

John O. Pollard, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for appellants.

Michael A. Sheely, Charlotte, N. C. (Joyce M. Brooks, Shelley Blum, Charlotte, N. C., on brief), for appellees.

Before BUTZNER, RUSSELL and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

The present appeal stems from a class action suit filed in May, 1976, by plaintiffs Shirley Brown and Dorothy Black against Eckerd Drugs, Inc., charging discrimination in hiring, firing, promotion, job assignment, and geographical assignment at its Mecklenburg County facilities, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. Brown and Black complained, in addition to their class allegations, that each had been discriminatorily terminated. Although the class initially included rejected applicants for employment, as well as past and present employees, the district court, after our decision in *Hill v. Western Electric Co., Inc.*, 596 F.2d 99 (4th Cir. 1979), *cert. denied*, 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979), excluded applicants from the class. After trial, Almetta Ivey, a member of the original class who had testified at trial that she was discriminatorily demoted from a supervisory position, was permitted to intervene as a named plaintiff. After further modification, the class ultimately was defined as past and present employees who claimed that the defendant discriminated on the basis of race in connection with promotion or transfer to management and supervisory positions in the defendant's Mecklenburg facilities.

On the merits, the lower court found that the Company discriminated against the plaintiffs and their class. In addition, Brown and Ivey prevailed on their individual claims. Plaintiff Black, however, failed.[1] Accordingly, the court granted reinstate-

---

1. No appeal was taken from the denial of Black's individual claim nor from the denial of individual relief to several other class members who presented claims at trial. Nor do the plaintiffs contest the various modifications of the class.

ment and backpay to Brown and Ivey and enjoined those promotion and transfer practices found to discriminate against minorities. On appeal, the defendant contends that the original plaintiffs had no "standing" to represent a class concerning claims other than discriminatory discharge; that the district court erroneously permitted class member Ivey to intervene as a named plaintiff a year after trial; and that the individual and class claims of discrimination were not proved. On each issue we affirm the judgment of the district court.

Eckerd Drugs, Inc. and its successors ("Eckerd") have operated several retail stores and a warehouse from corporate offices in Mecklenburg County, North Carolina. The main office employs clerical, professional and management workers. The retail stores are run by a store manager and assistant manager, pharmacist, fountain manager, fountain personnel and sales personnel. The store managers report to district managers who are responsible for various stores. The work force at the warehouse, located in the same facility as the main office, includes stockers, receiving and shipping clerks, checkers, and forklift and truck drivers.

The district court found that Eckerd's promotion and transfer policies, utilized at all facilities, were few: Eckerd maintained no job descriptions for supervisory positions, nor had it posted notices of managerial vacancies until 1978. There were no formal lines of progression into management or supervisory jobs. No written criteria have been utilized to determine the qualifications of a person to fill supervisory vacancies and the management representatives responsible for filling such positions, nearly all of whom are white, have had virtually complete discretion to fill the spots. Employees were evaluated only ir-

regularly and evaluation has been undertaken from memory without benefit of written criteria. A "word of mouth" system has been employed to notify employees of supervisory vacancies in other facilities. Before 1976, most supervisory personnel were white,[2] despite an employee work force composed of 14% blacks (34% blacks in the retail stores).

In September, 1974, plaintiff Shirley Brown was employed as a keypunch operator in the main office. In June, 1975, she left her job after several incidents evidencing racial bias. Plaintiff Dorothy Black, hired to work in a retail store, and subsequently promoted to fountain manager, was fired in 1975. Intervenor Ivey was hired in 1969 to work in the main office. From 1975 until 1977 she supervised the third party receivables department. In June of 1977, she was demoted after training a white supervisor to take her place.

## I.

■ Eckerd first contends that Brown failed to prove that she was discriminatorily discharged, and that Ivey did not show that she was discriminatorily demoted from a supervisory role. We have carefully examined the factual findings of the district court with respect to Brown and Ivey. Had we been sitting as the trial court, we might well have been inclined to find that Brown and Ivey did not sustain their burden of persuasion. On appeal, however, our function is the very restricted one of determining whether the district court's determination was clearly erroneous. Where there are conflicts in the testimony, we have kept in mind that the district court is in the best position to evaluate the witnesses' credibility and resolve the conflicts. Upon examination of the evidence as a whole[3] and of

**2.** Before 1973 only one black (Dorothy Black) had been employed in a managerial capacity outside the warehouse. Except for Almetta Ivey, no black at the time of judgment had ever held a supervisory position in the main office. Of Eckerd's 97 supervisory positions in the main office and stores in 1975, 3 (3.09%) were occupied by black persons. Warehouse employees fared significantly better. In 1975, of the 158 workers in the warehouse, 43 (27.6%)

were black. Of what were apparently 13 warehouse management or supervisory personnel that year, 3 (23%) were black.

**3.** We emphasize the necessity to evaluate the plaintiff's *prima facie* case as a whole. To evaluate each piece of evidence *seriatim*, the practice followed in the dissent, would impose an impossible and improper burden on the plaintiff.

the district court's findings of fact and law, we are not "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). We therefore affirm the judgments as to the individual claims.

The proper approach was outlined by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Burdine* reaffirmed the doctrine that when a Title VII plaintiff has established a *prima facie* case, the burden of production, but not persuasion, shifts to the employer, who must show some legitimate, nondiscriminatory reason for the employment decision. Should the employer make that showing, the plaintiff, in order to prevail, has the burden of persuading the trier of fact that the employer's proffered reason was pretextual. The Court further stated that, once the employer has successfully rebutted the plaintiff's *prima facie* case, the evidence *previously* introduced by the plaintiff can be considered by the trier of fact on the issue of whether the employer's explanation is pretextual. In fact, "there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Id.*, at 255 n.10, 101 S.Ct. at 1095 n.10.

Having set forth briefly the applicable law, we now discuss in turn the Ivey and Brown claims.

A. *Ivey Claim*

Ms. Ivey was first hired by the defendant in 1969 as an accounts payable clerk in its main office. At that time she was the only black employee in a supervisory position. In April, 1976, she was appointed supervisor of a new department, third party receivables. Both the plaintiff's *prima facie* case and the defendant's rebuttal rely on the details of her occupation of that position until she was replaced by a white woman in June, 1977.

Ms. Ivey's performance was neither outstanding nor inadequate. On several occasions, as late as May, 1977, her supervisor, Mr. Dale Whitworth, told her that she was doing a good job, and that he felt she could run the department. He also told her, however, on two occasions that he was not sufficiently satisfied with her performance to give her a pay raise. His specific criticisms were threefold.

First, Mr. Whitworth had received complaints that too much noise was coming from the department. Ms. Ivey told him that one employee in particular was responsible for the noise, and that the employee, who was the sister-in-law of Mr. Whitworth's secretary, refused to listen to Ms. Ivey. Mr. Whitworth neither fired the employee nor gave Ms. Ivey the authority to fire her. Rather, he said he would talk to her, and told Ms. Ivey that she was responsible for controlling her employees. His lack of effective support contrasts sharply with a similar situation involving a white supervisor of the other plaintiff, Brown, in which management provided strong support for the supervisor. *See* p. 1273 *infra.*

Second, on one occasion when Ms. Ivey was absent from the office, Mr. Whitworth found in her desk unfinished work, including checks which had not been deposited. When she returned to work, Mr. Whitworth asked her about the unfinished matters, and she responded that her department was overworked and understaffed. During the time Ms. Ivey ran the department there were never more than three employees, as compared with the five or six Mr. Whitworth promised when he offered her the supervisory position.

Finally, Ms. Ivey was unable to prepare the "outstanding balance reports" which she was supposed to file each month. Again, she attributed the failure to lack of staff, and Mr. Whitworth was sufficiently persuaded by her explanation to agree in May, 1977 that he would meet with her in July to review her performance, and that she should prepare an outstanding balance

report by then. At the same time he reiterated that her performance was good and that he felt she was capable of running the department.

Against that background, two weeks after he expressed confidence in Ms. Ivey, and well before the July, 1977 deadline for an outstanding balance report, Mr. Whitworth informed Ms. Ivey that she was being replaced as supervisor by Marilyn Wilkes, a white woman. Ms. Ivey helped train her replacement to the extent of explaining the department's workings. Mr. Whitworth gave no explanation for the demotion beyond the general statement that he felt she could not handle the department, contrary to his confidence of two weeks earlier. At trial he testified that Eckerd was planning to adopt a new, more sophisticated system for controlling third party receivables, and that he did not believe Ms. Ivey could handle the new system.

From these facts, the district court was justified in concluding that the plaintiff had established a *prima facie* case of discrimination against Eckerd. When hired, Ms. Ivey was the only black in the main office. As late as 1975, only 7.4% of all employees in the main office were black. She was treated less favorably than a white supervisor when she encountered problems with a subordinate. Finally, she was replaced by a white person despite her superior's recently expressed confidence in her. The district court's finding that Ms. Ivey established a *prima facie* case was correct.

The next step in the *Burdine* analysis is the employer's rebuttal. Eckerd met its burden to rebut Ms. Ivey's *prima facie* case. Eckerd showed that Ms. Ivey was unable to control her department's noise level, that she left uncompleted work while she was on vacation, and that she failed to provide monthly reports in a timely fashion. Taken together, those deficiencies could comprise legitimate and nondiscriminatory grounds to demote Ms. Ivey.

In response to Eckerd's rebuttal, Ms. Ivey was entitled to show that the proffered ground was not in fact the reason for demotion, but was merely a pretext. She offered no additional evidence to make that showing, but additional evidence is not required. The present case falls within the realm of *Burdine's* footnote 10, p. —— *supra.* Taking together all of the evidence which comprised the plaintiff's *prima facie* case and the defendant's rebuttal one might reasonably conclude, even without any additional evidence from the plaintiff, that the deficiencies in Ms. Ivey's performance were beyond her control, that Mr. Whitworth was aware of that fact, and that he fired her, at least in part, because she was black. Judge McMillan reached that conclusion. Alternatively, one might conclude that the deficiencies were the sole reason for her dismissal. On appeal, we need not—indeed, may not—choose between the two, because the district court's conclusion was not clearly erroneous and, therefore, must be accepted.

The dissent is correct to identify language in the district court opinion which is subject to criticism. The bald statement that Eckerd failed to rebut the *prima facie* case is difficult to reconcile with the evidence. Furthermore, the court's expressed requirement that the defendant show Ms. Ivey's replacement was as qualified as, or more qualified than, Ms. Ivey does not follow *Burdine.* However, the district court found as a fact that race was one reason for the demotion of Ms. Ivey, and its finding was amply supported by the evidence. We therefore affirm the court's ruling as to Ms. Ivey.

**B. *Brown Claim***

■ Ms. Brown was employed as a keypunch operator in the defendant's main office until June 3, 1975. Her claim is predicated on the theory of "constructive discharge." In order to make out a *prima facie* case of constructive discharge, the plaintiff must show by a preponderance of the evidence that she was forced to quit her employment by intolerable working conditions imposed on her by her employer, who was motivated in such imposition by racial or sex bias. *See, e. g., J. P. Stevens & Co. v. NLRB*, 461 F.2d 490, 494 (4th Cir. 1972).

Here, the *prima facie* case rests on events which occurred at a conference held on June 3, 1975, as well as several earlier events.

First, a white employee who shared Ms. Brown's work station repeatedly bumped into her chair, in a manner Ms. Brown believed to be deliberate. The bumping was particularly uncomfortable because Ms. Brown had recently given birth to a child by caesarean section. On several occasions, Ms. Brown requested that her supervisor, Penny Hart, change her work station, but Ms. Hart refused, although there were vacant work stations at the time. She said that she expected to make a complete reassignment of work stations in the department, and would reassign Ms. Brown at that time. Ms. Brown, believing her work situation intolerable, then spoke to Mel Harvey, who she believed had authority to make the change immediately. Mr. Harvey referred her to Mr. Straughn, Ms. Hart's supervisor, and Mr. Straughn refused to make a change. He stated that such matters were within Ms. Hart's discretion. Ms. Brown responded that she would not "put out a hundred percent." When Mr. Straughn told her to "put out a hundred percent or else," Ms. Brown replied that she would do her best, but didn't think it possible to function at full efficiency under such circumstances. Her work station was finally changed three weeks after her initial request.

Taken alone, this incident could be seen as an employer's reasonable response to an employee's insubordination. The district court, however, found that the work station unpleasantness was one of many incidents which, when taken together, made Ms. Brown's working conditions intolerable. It is certainly plausible on the district judge's part to conclude that, when a white employee repeatedly bumps a black employee, who has recently undergone surgery, and management fails to take immediate action to remedy the situation, the employer is acting to make the black employee's conditions of employment intolerable because of her race.

Second, Ms. Brown testified that on June 2, 1975, she observed Mr. Straughn and others watching her work, and that, when she passed within hearing distance she heard Mr. Straughn use the term "nigger." Eckerd emphasizes that on no other occasion did anyone use racially objectionable language in Ms. Brown's presence. However, this incident, like the first, is probative of the working conditions imposed on Ms. Brown, and the racial bias of her superior. It is relevant to, although not dispositive of, the issue of constructive discharge, and the district court was entitled to take it into consideration.

Third, Ms. Brown testified that, when she returned from her maternity leave, she was told that no changes in the computer format had been made, but in fact there had been substantial changes, which rendered it impossible for her to work effectively. Ms. Brown testified that she requested assistance from Ms. Hart, and that her request was refused. Ms. Hart denied having received any such request. The district court, which had the benefit of observing the witnesses' demeanor as they testified, found that such a request was made, and that finding comprises the third component of the *prima facie* case. Again we might have found differently than the trial judge, but the evidence was there to support his conclusion, which must be accepted since it was not clearly erroneous.

Finally, the events which occurred during the meeting on June 3, 1975 between Ms. Brown and her supervisors compose the final evidence in the *prima facie* case. Present at the meeting were Ms. Brown, Ms. Hart, Mr. Straughn, and a personnel representative, Glenda Hanner. Ms. Brown was questioned about her high rate of absenteeism, which she attributed to her difficult pregnancy, and her child's illnesses. She was asked to improve her attendance, and, she testified, to promise not to be absent at all in the future. She promised to try to improve her attendance in the future.

More important than the substance of the meeting was its tone. Ms. Hanner acted as an "interpreter" for Ms. Brown. Ms.

Brown testified, "They would ask me something and I would give the answer to it and Glenda would rephrase my answer using bigger terminology, you know, I guess so they could understand better." When Ms. Hanner took the side of Mr. Straughn and Ms. Hart on some matters, racial accusations became more open. Ms. Brown said Ms. Hanner claimed she didn't know there was any black-white dispute. Mr. Straughn addressed Ms. Brown as "girl," while pointing his finger in her face, and Ms. Hart called her a "fool." Ms. Brown then asked that a black employee be brought into the meeting, but her request was denied, so she refused to talk further. Ms. Hanner suggested that Ms. Brown might be happier working elsewhere, and, Ms. Brown testified, Ms. Hart told her she was fired. She then went out to the company parking lot, and Mr. Straughn there told her to leave the premises.

From this evidence it is clear that Ms. Brown established a *prima facie* case of constructive discharge. She was treated rudely by a white employee, and not supported by management. It appeared she was called a "nigger" by the highest official with whom she had contact. Her supervisor refused to assist her when the computer format was changed during her maternity leave. Finally, during a conference with supervisors, she was dealt with in a condescending and abusive manner which the district judge could properly find to be suggestive of racial animosity. Her sentences were "translated" by a white person, she was addressed as "girl," and she was called a "fool," before being ordered off the premises. The district court found, with substantial support, that the employer made her working conditions intolerable, that it did so in order to force her to quit, and that its motivation was, at least in part, racial.

Again Eckerd offered enough evidence to rebut the *prima facie* case. The refusal to reassign Ms. Brown to a new station may have been mere compliance with a sensible departmental practice. Her supervisor may not have refused to assist her, if the supervisor's testimony is believed. The condescending behavior at the meeting may, as Eckerd claims, have been Ms. Brown's irrational perception due to her anger. In sum, Ms. Brown may have been properly discharged because of her insubordination at the meeting.

However, even granting that Eckerd offered sufficient proof of facts to demonstrate a legitimate reason for Ms. Brown's constructive discharge, it was the district court's role to evaluate all of the evidence in order to determine whether the reason advanced was a pretext. Here, again, the plaintiff was not required, under *Burdine*, to introduce new evidence to show that the employer's legitimate reason was a pretext. Looking at all the evidence, one might reasonably conclude that the employer deliberately harassed Ms. Brown until it succeeded in prevailing on her to quit, and that the motivation was racial bias. That was the conclusion the district court reached. A rejection of the finding would constitute an impermissible crossing of the boundary line between what an appellate court may do and what falls within the trial court's ambit. We must affirm the district court, because its view was not clearly erroneous.

## II.

■ Eckerd also contends that Brown, Black, and Ivey were not "appropriate" representatives of the class under *Hill v. Western Electric, supra*, 596 F.2d 99, because the named representatives suffered injury "different" than that of members of the class.[4] Since the class in this case ultimately in-

---

4. The defendant does not contend that Brown, who worked in the main office, and Black, who worked in a retail store, are, simply on geographical grounds, ineligible to represent warehouse employees complaining of exclusion from supervising positions. *See Hill v. Western Electric, supra*, 596 F.2d at 102–03. *But see Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976) (two plants of same employer treated as single facility for purpose of class action representation). We note, in any event, that the relevant labor market for supervisory positions in all three operations was comparable.

cluded just employees at the defendant's main office, warehouse, and several of its retail stores who complained of failure to promote or transfer into management and supervisory jobs, we consider Eckerd's argument only in relation to the final class definition. Moreover, since we hold that Brown and Black were at all times appropriate representatives of the indicated class, we have no occasion to address the issue of whether Ivey's post-trial intervention cured any asserted certification defect based on the contention that Brown and Black lacked "standing" under Rule 23(a) to represent the class.

In *Hill*, we held, in the circumstances of that case, that an employee, who had been hired, could not represent a class that included persons who were denied employment altogether. However, *Hill* did not preclude an *employee* who suffers *some* particularized employment discrimination grievance from representing other *employees* who present factually differing claims that, nevertheless, proceed on the same legal theory of race discrimination.[5] *Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975); *cf. East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). As stated by the court in *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 831 (8th Cir. 1977), *cert. denied*, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977), "[w]hen the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment." *See also Gibson v. Local 40, Super-*

cargoes and Checkers of the International Longshoremen's and Warehousemen's Union*, 543 F.2d 1259, 1264 (9th Cir. 1976); *Russell v. American Tobacco Co.*, 528 F.2d 357, 365 (4th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976). *Crockett v. Green*, 534 F.2d 715 (7th Cir. 1976).[6]

██  Where an employee presents a particularized claim of racial injury, she may represent a class of other employees in bringing a general challenge to workplace discrimination. *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 900 (5th Cir. 1978), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978); *Donaldson v. Pillsbury Co.*, supra, 554 F.2d at 830–31; *Senter v. General Motors Corp.*, 532 F.2d 511, 524 (6th Cir. 1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). The nature of employment discrimination injury is such that all minority employees suffer similar injury when unlawful practices governing the conditions of their workplace either perpetuate a discriminatory work environment or subject them to a substantial risk that they will be denied employment benefits in the future on account of their race. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 208–09, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972) (two tenants, one black and one white, are "persons aggrieved" under Title VIII of the Civil Rights Act of 1968 when their landlord discriminates against nonwhites in the rental of apartments); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 111–15, 99 S.Ct. 1601,

---

5. That Brown and Black are former employees does not affect their capacity to represent current employees. *See Jenkins v. Blue Cross Mutual Hosp. Ins., Inc.*, 538 F.2d 164, 169 (7th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976); *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir. 1975). *Cf. United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (former prisoner no longer subject to Parole Commission guidelines has standing to appeal denial of class certification).

6. *Patterson v. General Motors Corp.*, 631 F.2d 476 (7th Cir. 1980), *cert. denied*, 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981), does not alter the Seventh Circuit's support for broad Rule 23 standing where an employee raises complaints about *general* employment practices that affect other employees—past, present or potential—as well as himself. *See, e.q., Crockett, supra*, 534 F.2d 715. In *Patterson*, the complaint alleged facts that "relate[d] solely to plaintiff's personal grievances," and the appeals court held that where such a plaintiff "has simply asserted *no* facts relating to other members of the purported class," the district court's denial of class certification was not an abuse of discretion. 631 F.2d at 480–81 (emphasis in original).

1614–16, 60 L.Ed.2d 66 (1979) (deprivation of benefits of interracial associations constitutes sufficient injury to accord plaintiffs' constitutional standing); *Coles v. Havens Realty Corp.*, 633 F.2d 384, 388–90 (4th Cir. 1980), *cert. granted*, 451 U.S. 905, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981) (named representatives of a class challenging racially discriminatory "steering" practices of the defendant realty companies suffered injury to their interest in "living in integrated communities free from discriminatory housing practices"); *Rogers v. Equal Employment Opp. Comm'n*, 454 F.2d 234, 237–39 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972) (Goldberg, J.) (employee may challenge discriminatory work environment created by segregation of patients); *Waters v. Heublein, Inc.*, 547 F.2d 466, 469–70 (9th Cir. 1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977) (white employee has standing to sue employer who discriminates against minorities since she has statutory right to work environment free of racial prejudice). All employees of a firm that allegedly discriminates in promotions have an identical interest in obtaining declaratory and injunctive relief against the perpetuation of the challenged practices. Therefore, quite apart from any possibility of sharing in classwide damages as to practices to which the named representative alleges no particularized individual claim, employee representatives share interests of a kind with other employees in redressing racially dis-criminatory employment practices that either pollute their working environment or else threaten them with harm in the foreseeable future.

Additionally, we note that class members—including named representatives—who have not applied for a promotion may nevertheless be eligible to share in any monetary relief awarded the class provided each can demonstrate that she would have applied for promotion but for the defendant's discriminatory promotion practices. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 362–68, 97 S.Ct. 1843, 1868–71, 52 L.Ed.2d 396 (1977). In the typical Title VII bifurcated trial, which splits the liability stage (and, consequently, all class certification decisions) from the remedial stage, a putative representative's possible eligibility for sharing in any class relief will not, in the normal course of affairs, be known until after his or her eligibility to litigate class claims has been determined. That the Supreme Court anticipates the possibility of obtaining such relief in the remedial stage underscores our conclusion that Brown and Black have, indeed, been personally injured by the practice they challenge.

Under these standards, Brown and Black are entirely appropriate representatives. At the time of certification, each could show that, in addition to her individual claim of discriminatory dismissal, she labored under the allegedly discriminatory promotion practices of the defendant.[7]

7. Although plaintiff Black failed at trial to prove her individual claim, her loss does not moot or destroy the class claims. As the Supreme Court has stated:

> Obviously, a different case would be presented if the District Court had certified a class and only later had it appeared that the named plaintiffs were not class members or were otherwise inappropriate class representatives. In such a case, the class claims would have already been tried, and, provided the initial certification was proper and decertification not appropriate, the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims. *See, e. g., Franks v. Bowman Transportation Co.*, 424 U.S. 747, 752–757, 96 S.Ct. 1251, 1258–60, 47

L.Ed.2d 444 (1976); *Moss v. Lane Co.*, 471 F.2d 853, 855–856 (CA4). Where no class has been certified, however, and the class claims remain to be tried, the decision whether the named plaintiffs should represent a class is appropriately made on the full record, including the facts developed at the trial of the plaintiffs' individual claims. At that point, as the Court of Appeals recognized in this case, "there [are] involved none of the imponderables that make the [class-action] decision so difficult early in litigation." 505 F.2d at 51. *See also Cox v. Babcock & Wilcox Co.*, 471 F.2d 13, 15–16 (CA4).

*East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 406 n.12, 97 S.Ct. 1891, 1898 n.12, 52 L.Ed.2d 453 (1977). In addition, the Supreme Court has recently held that the expiration of a named plaintiff's individual claim does not

Each of the named plaintiffs, the district court found, worked in a system in which virtually none of the supervisors were black or minority. Indeed, the one black supervisor in the main office, Almetta Ivey, had been demoted from her supervisory position. As employees allegedly injured by the Company's maintenance of a hierarchically segregated work environment supervised by a largely white managerial staff,[8] therefore, Brown and Black were proper parties under *Hill* and *Barnett* to represent an employee class challenging employment practices that generally affected minority employees adversely.

Moreover, if successful on their individual claims and reinstated, each named plaintiff, at the time of certification, could anticipate that she would once again be subjected to Eckerd's discriminatory promotion practices. Eckerd's failure to post notices of or provide job descriptions for supervisory vacancies, its reliance on word-of-mouth notice of vacancies, its lack of regularized objective means of employee evaluation, the absence of objective criteria governing promotions into supervisory positions, and its complete reliance on managerial discretion in making promotion decisions are classic means by which minorities are locked into static positions. *Brown v. Gaston County Dyeing Mach. Co.*, 457 F.2d 1377, 1382–83 (4th Cir. 1972), *cert. denied*, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); *Barnett v.*

*W. T. Grant Co., supra*, 518 F.2d at 549–50; *Rock v. Norfolk & Western Ry.*, 473 F.2d 1344 (4th Cir. 1973), *cert. denied*, 412 U.S. 933, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973); *Rowe v. General Motors Corp.*, 457 F.2d 348, 358–59 (5th Cir. 1972). At the time of certification, therefore, Brown and Black could show that, in addition to their particularized claims of discriminatory dismissal, each was injured by discriminatory promotion practices. *See Rodriguez, supra*, 431 U.S. at 403, 97 S.Ct. at 1896. Therefore, Brown and Black were appropriate representatives of an employee class at all relevant times during the litigation. *See generally*, Note, *Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2)*, 88 Yale L.J. 868 (1979); Note, *The Proper Scope of Representation in Title VII Class Actions: A Comment on East Texas Motor Freight System, Inc. v. Rodriguez*, 13 Harv.C.R.–C.L.L.Rev. 175 (1978).

### III.

Eckerd maintains that the district court erred when it allowed class member Almetta Ivey to intervene after trial as a named plaintiff. The contention is without merit.

The district court permitted Ms. Ivey to intervene both as of right, Fed.R.Civ.P. 24(a),[9] and pursuant to trial court discretion, Fed.R.Civ.P. 24(b).[10] Since we per-

---

moot or destroy putative class claims, and that such a plaintiff has standing to appeal a denial of class certification. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). *See Satterwhite v. City of Greenville*, 578 F.2d 987 (5th Cir. 1978) (*en banc*) (holding that named plaintiff who lost her individual Title VII claim on the merits before class certification could not represent the putative class), *vacated and remanded*, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980), *on remand*, 634 F.2d 231 (5th Cir. 1981) (*en banc*).

8. *See* note 2, *supra*.

9. Fed.R.Civ.P. 24(a):
   *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an

interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

10. Fed.R.Civ.P. 24(b):
    *Permissive Intervention.* Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued

ceive no abuse of discretion under Rule 24(b), we do not decide whether Ivey, as a class member, had a right to intervene. It is enough that the district court had a discretionary power to permit her intervention.

Rule 24(b) provides that a district court may allow intervention by "anyone" when the "applicant's claim or defense and the main action have a question of law or fact in common." Here, in her complaint, Ms. Ivey contended that she was demoted from a supervisory position on account of her race. Certainly, since she was already a class member, her claim presented issues of law and fact in common with those of the class. *See generally* 7A Wright and Miller, Federal Prac. & Proc. §§ 1911, 1916 (1972 & 1981 Supp.). In addition, Fed.R.Civ.P. 23(d)(2) and (3)[11] expressly anticipate that class members may wish to intervene as named parties. The defendant has not suggested that it was prejudiced by Ivey's intervention as a named plaintiff a year after the trial. Indeed, since her claim had been presented at the trial, it would be difficult for the defendant to suggest that her metamorphosis into a named plaintiff worked to its detriment.[12] *See Muskelly v. Warner & Swasey Co.*, 653 F.2d 112 (4th Cir. 1981)

(class member permitted to intervene after trial as named representative). Therefore, we conclude that the decision to allow Ivey to intervene was proper, and that her actual intervention in the litigation after trial was timely. *See United Airlines, Inc. v. Mc-Donald*, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977) (allowing class member to intervene after judgment for purpose of appealing denial of class certification); *Wheeler v. American Home Products Corporation, supra*, 563 F.2d 1233; *McDonald v. E. J. Lavino Co.*, 430 F.2d 1065 (5th Cir. 1970) (intervention after judgment allowed).

## IV.

Having carefully reviewed the remainder of defendant's contentions, including the sufficiency of proof on the class claims, we find no error.

*AFFIRMED.*

DONALD RUSSELL, Circuit Judge, dissenting:

I dissent.

I first address the individual claims of the class members. In so doing, it is necessary only to consider the charges made by Ms.

---

or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

11. Fed.R.Civ.P. 23(d):

*Orders in Conduct of Actions.* In the conduct of actions to which this rule applies, the court may make appropriate orders: ... (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; ....

12. Nor can Eckerd complain that Ivey failed to exhaust Equal Employment Opportunity Commission (EEOC) administrative procedures.

Eckerd received notice of EEOC charges filed by Brown and Black prior to the commencement of the litigation. Brown's and Black's charges included complaints about the defendant's practices concerning hiring, assignment, promotion, and geographical assignment, among other employment practices. Their charges encompassed Ivey's individual complaint. It is not necessary that each class member, named plaintiff, or intervenor file charges with the EEOC. *See Wheeler v. American Home Products Corporation*, 563 F.2d 1233, 1238–40 (5th Cir. 1977) ("If back pay may properly be awarded in a class action to members of a class [who] do not meet the jurisdictional requisites, there seems no reason, in an action not a class action, to deny back pay to intervenors who do not meet the jurisdictional requisites"); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498 (5th Cir. 1968). In any event, Ms. Ivey filed an EEOC charge on June 23, 1977, and received a right to sue letter on April 29, 1979; her petition to intervene was granted on July 26, 1979.

Brown and Ms. Ivey,[1] since all other claims by individual members were dismissed on their merits and there is no appeal from such dismissal.

## I

The flaw in the disposition of both the Brown and the Ivey charges is the failure of the District Court to apply the *Burdine* burden of proof rule in disposing of these claims.[2] Under *Burdine*, the plaintiff has "[t]he burden of establishing a prima facie case," which the Court declared was not an "onerous" burden.[3] If the plaintiff establishes such *prima facie* case, the burden shifts to the employer "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. *See Sweeney, supra* [439 U.S. 24] at 25 [99 S.Ct. 295, at 296, 58 L.Ed.2d 216]. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."[4] Specifically, this burden imposed at this point on the employer is not "to introduce

evidence, which, in the absence of any pretext, would *persuade* the trier of fact that the employment action was lawful" (Emphasis the Court's), but only to "articulate lawful reasons for the action."[5] More important, for purposes of this case, *the employer is not required "to prove by objective evidence that the person hired or promoted was more qualified than the plaintiff."* (Emphasis added)[6] In fact, one of the actual grounds for reversal in *Burdine* was the error of the Court of Appeals in imposing on the employer the burden of proving by objective evidence that those hired or promoted were better qualified than the plaintiff.[7] When the employer has met this burden of articulating (not *persuading*) a lawful reason for his act, "the presumption raised by the prima facie case is *rebutted*, and the factual inquiry proceeds to a new level of specificity." (Emphasis added)[8] To prevail, then, the plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision," but was discriminatory, and here the burden of persuasion rests on the plaintiff.[9]

In neither the Brown nor the Ivey case did the District Court follow this plainly

1. For the moment, I am disregarding the obvious fact that Ms. Ivey's claim is not within the class certified by the District Court. The plaintiffs' counsel recognized this and sought by an untimely attempt to correct it with a motion to permit the filing of an amended complaint in favor of Ms. Ivey. For reasons later discussed in connection with the class certification, I think Ms. Ivey's claim should be dismissed on that ground, too.

2. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). For a subsequent decision applying *Burdine, see Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir. 1981).

3. Id., 450 U.S. at 253, 101 S.Ct. at 1094.

4. Id., 450 U.S. at 254, 101 S.Ct. at 1094.

5. Id., 450 U.S. at 257, 101 S.Ct. at 1096.

6. Id., 450 U.S. at 257, 101 S.Ct. at 1096.

7. The actual language of the Court of Appeals, which was disapproved by the Supreme Court, is quoted in note 11 of the Supreme Court's opinion. Id., 450 U.S. at 256, 101 S.Ct. at 1095:
   " 'The court reviewed the defendant's evidence and explained its deficiency:

   " 'Defendant failed to introduce comparative factual data concerning Burdine and Walz. Fuller merely testified that he discharged and retained personnel in the spring shakeup at TDCA primarily on the recommendations of subordinates and that he considered Walz qualified for the position he was retained to do. Fuller failed to specify any objective criteria on which he based the decision to discharge Burdine and retain Walz. He stated only that the action was in the best interest of the program and that there had been some friction within the department that must be alleviated by Burdine's discharge. Nothing in the record indicates whether he examined Walz' ability to work well with others. This court in *East* found such unsubstantiated assertions of 'qualification' and 'prior work record' insufficient absent data that will allow a true *comparison* of the individuals hired and rejected. 608 F.2d at 568.''

8. Id., 450 U.S. at 256, 101 S.Ct. at 1095.

9. Id., 450 U.S. at 256, 101 S.Ct. at 1095.

marked procedure as mandated by *Burdine*. The decision below in these cases should be reversed or, at least, remanded for further action in the light of the standards declared in *Burdine*, which actually were not new but were simply a clearer reaffirmation of the prior decisions in *Sweeney*,[10] *Waters*,[11] and even *McDonnell Douglas*,[12] as we recognized in *Ambush v. Montgomery Cty. Government, Etc.*, 620 F.2d 1048, 1052 (4th Cir. 1980) and, as several District Courts in this Circuit have recognized, *Day v. Patapsco & Back Rivers R. Co.*, 504 F.Supp. 1301, 1311 (D.Md.1981); *Cussler v. University of Maryland*, 430 F.Supp. 602, 605 (D.Md.1977). In so reversing or remanding, we would be following the well reasoned opinion of Judge Friendly in *Ste. Marie v. Eastern R. Ass'n.*, 650 F.2d 395 (2d Cir. 1981).

In *Ste. Marie* the charge was sex discrimination "in appointments to technical and managerial positions." The District Court, as here, found in favor of the plaintiff and her class. In reversing, the Court said:

"The overarching reason why the decision must be reversed is that the judge, having concluded, perhaps wrongly, that plaintiff had established a *prima facie* case, proceeded on the basis of a clearly improper standard as to the burden thereby placed on the defendant. He stated, 458 F.Supp. at 1165, that the establishment of a *prima facie* case of sex discrimination 'the burden shifted to the defendant to rebut plaintiff's case, and its failure to do so compels the conclusion that its policies and practices violate the Act.'

"This was error. It has been clear ever since *McDonnell Douglas, supra*, 411 U.S. at 802, 93 S.Ct. at 1824, that the burden that is shifted to the defendant by plaintiff's making out a *prima facie* case of disparate treatment—a task described in *Burdine* as 'not onerous', 450 U.S. at 253, 101 S.Ct. at 1093—is not a burden of persuading the trier of a business necessity to employ or promote a person belonging to the majority. The shifted burden is simply 'to articulate some legitimate, nondiscriminatory reason for the [minority] employee's rejection.' 411 U.S. at 802, 93 S.Ct. at 1824. This follows necessarily from the language and purpose of Title VII. The employer is not required to hire or promote a minority employee; rather he is forbidden to refuse to hire or promote such an employee because of race or sex. Hence he sufficiently rebuts a *prima facie* case by pointing to a business reason for his employment decision. By doing this he adequately negates, for the time being, the force of a plaintiff's initial showing that a qualified minority employee was denied employment or promotion which was given a majority employee instead. The plaintiff then has the burden 'to show that [the] stated reason ... was in fact pretext,' 411 U.S. at 804, 93 S.Ct. at 1825, or, as later phrased, *id.* at 805, 93 S.Ct. at 1826, 'that the presumptively valid reasons' for failure to hire or promote 'were in fact a coverup for a racially [here sexually] discriminatory decision.' Justice Powell's recent opinion in *Burdine, supra*, simply elaborates in a helpful fashion on the theme sufficiently sounded eight years ago in *McDonnell Douglas* from which the Court has never deviated. The district court's conclusion that defendants had followed a pattern and practice of disparate treatment must therefore fall as based on an erroneous allocation of the burden of proof." [13]

## II

Turning first to the Ivey claim: At the outset, it is to be noted that the district court's decision sustaining Ms. Ivey's racial

**10.** *Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

**11.** *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978).

**12.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–01, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973).

**13.** 650 F.2d at 398–99.

The same result was reached in *Daye v. Harris*, 655 F.2d 258 (D.C.Cir.1981).

discrimination claim is fatally flawed by two critical errors of law. That the district court, in analyzing the facts as a basis for its final conclusions, utilized these erroneous legal standards cannot be disputed. These legal errors—both vital in the factual analysis of the claim—are plain and obvious in the opinion itself. Indeed, the majority concedes that such decision is contrary to the recent decision of the Supreme Court in *Burdine* in two vital particulars. Nor could it hardly have done otherwise. The first of such errors, which related to the burden of proof in this discriminatory treatment case, is, in the words of the majority, "difficult to reconcile with the evidence." The majority might more accurately have said that it was *impossible* "to reconcile" the district court's ruling on the burden of proof with the law, as declared in *Burdine*, for such is the plain fact as the majority recognizes by making no effort to "reconcile" the decision of the district court with the evidence. The second error imposed improperly on the defendant a "requirement that the defendant show that Ms. Ivey's replacement was as qualified as, or more qualified than, Ms. Ivey." The majority candidly acknowledges that the district court, in so holding, did "not follow *Burdine*." The majority, however, blandly dismisses these admitted violations of the rules declared in *Burdine* by declaring, applying the clearly erroneous rule ("... our function is the very restricted one of determining whether the district court's determination was clearly erroneous"), simply that "the district court found as a fact that race was one reason for the demotion of Ms. Ivey, and its finding was amply supported by the record."

Such a "brush-off" of the flagrant violations of *Burdine* by the district court in reaching its decision disregards the fact that the very finding and conclusions it affirms (*i. e.*, "that race was one reason for the demotion") was arrived at by the district court *only* as a result of a factual analysis of Ms. Ivey's claim made on the basis of the district court's erroneous legal rules on burden of proof and on the necessity of the defendant's establishing that Ms. Ivey's replacement was better qualified

than Ms. Ivey. These two rulings, both concededly erroneous, lie at the very heart of the district court's finding "that race was one reason" for Ms. Ivey's demotion. Critical legal errors—errors such as the two here, which can be decisive in the result reached by the court, are not to be dismissed as the majority has done by a routine incantation of the clearly erroneous rule. Since the finding that Ms. Ivey's demotion was racially motivated as arrived at by an application of what it must be admitted were two critical errors of law, the majority errs in assuming that the proper standard of review is, the clearly erroneous rule. This was made quite clear in our decision in *Owen v. Commercial Union Fire Ins. Co.*, 211 F.2d 488, 489 (4th Cir. 1954) where we said:

> "The trial judge held that the burden of proof rested upon the plaintiff 'to prove, by the weight of the credible evidence, that he has not been guilty of wilfully concealing or misrepresenting any material fact or circumstance'. This was clearly erroneous. The burden of proof rested upon the defendant to establish the fraud alleged. (citing cases) And we think that the error is of such a nature that we should vacate the judgment and remand the case for further hearing. The rule that an appellate court will not disturb findings of fact made by the trial judge unless they are clearly erroneous does not apply if he has committed an error of law which has manifestly influenced or controlled his findings of fact, such as mistake as to the burden of proof."

We restated this same principle in *Piedmont Minerals Company v. United States*, 429 F.2d 560, 562, n. 4 (4th Cir. 1970):

> "To be sure, in making this determination of fact the district court must apply relevant legal principles, and a factual determination made in disregard of the applicable principles of law, or made through gross overemphasis on one relevant principle to the exclusion of others, will be reversed because of the application of an improper legal standard. This is not the case here."

In so ruling, we were following the rule adopted universally in federal courts, and applied as well in Title VII cases as in other types of cases. *Johnson v. Uncle Ben's, Inc.*, 628 F.2d 419, 422 (5th Cir. 1980); *United States v. Texas Ed. Agcy., Etc.*, 564 F.2d 162, *reh. denied*, 579 F.2d 910 (5th Cir.), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374, 1382 (5th Cir.), *cert. denied*, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979); *Rowe v. General Motors Corporation*, 457 F.2d 348, 356, n. 15 (5th Cir. 1972); *Ammerman v. Miller*, 488 F.2d 1285, 1300 (D.C.Cir. 1973).[14] Moreover, it was the rule adopted and followed by the Supreme Court itself in *Burdine, see* 450 U.S. at 259 n.12, 101 S.Ct. at 1097 n.12. If this rule is applied, there is no escape from a reversal of the decision of the District Court.

The factual record of the Ivey claim clearly sustains the foregoing conclusions.

Ms. Ivey, the claimant, was initially employed by the defendant in 1969 in its main office. In December, 1975, when a new department (third party receivables) was created, she, a black, was made supervisor of that department. She was relieved as supervisor in June, 1977 (*without any reduction in salary*) and replaced by Marilyn Wilkes, a white. That may well have been sufficient, under the liberal rule for establishing a *prima facie* case as formulated in *Burdine*, to make out a *prima facie* case of racial discrimination. *See Lindsey v. Miss. Research & Development Center*, 652 F.2d 488, 491 (5th Cir. 1981). For purposes of this discussion, I shall accept that conclusion. But, under the *Burdine* standard, that only shifted the burden to the defendant to "articulate lawful reasons for the

action;" it certainly did not impose on the defendant any burden of persuasion or of rebutting the *prima facie* case. And the defendant did precisely meet its burden of articulating "lawful reasons" for its demotion of Ms. Ivey and that in overwhelming detail.

In so doing, the defendant began by establishing that almost from the outset, the department was not understaffed racially. Of its four employees, two were black and two white.[15] The two black employees at the beginning were the claimant Ivey and Theresa Hasty. When Theresa Hasty quit to return to school in Texas, Morris Abraham, also black was transferred into the department. Neither did the defendant seek to discriminate against blacks in the selection of the manager of the department. Ms. Ivey, a black, was chosen by Whitworth, the officer under whom the department operated, as the new department's supervisor. She retained that position from December, 1975 to June, 1977.

The function of the new department was the establishment of a control system over what the defendant described as "third party receivables", *i.e.*, claims for payment for prescriptions not from the person presenting the prescription but from "third parties", such as an insurance company. The operation of the new department was phased in gradually over a period of some months until it covered all the stores in the chain. One of the specific and important duties of the supervisor of the department was the preparation of an "outstanding balance report that she was supposed to present to [her superior] monthly." This report was not an elaborate or complicated

---

**14.** In *Rowe v. General Motors Corporation*, 457 F.2d at 356, n. 15, the Court said:

"GM argues that the sole consideration for this Court is whether or not the factual findings of the Trial Court were clearly erroneous under F.R.Civ.P. 52(a). But as we have so often pointed out, *Ferran v. Flemming*, 5 Cir., 1961, 293 F.2d 568; *United States v. Pickett's Food Service*, 5 Cir., 1966, 360 F.2d 338; *Dilworth v. Riner*, 5 Cir., 343 F.2d 226, and just so recently emphasized in a Title VII case, *United States v. Jacksonville Terminal*

*Co., supra*, 451 F.2d at 423–424, this does not apply to findings made under an erroneous view of controlling legal principles."

For recent Title VII cases, applying the same rule, see *Johnson v. Uncle Ben's, Inc., supra*, and *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1372, n. 20 (5th Cir. 1974).

**15.** Blacks represented a larger proportion of the employees in the department than their proportion in the Charlotte population area.

report; to prepare it merely required the collection of "each one of the pages for each one of the stores at the end of the month and combin[ing them into] the totals." According to the defendant's undisputed testimony, the plaintiff Ivey, though she was the supervisor charged with the responsibility of preparing these monthly reports, did not prepare or file a single monthly report in the months between her appointment as a supervisor in December, 1975 and her demotion in June, 1977. She was repeatedly requested during this time to furnish such report. Her reply was always that she was "working on the report." Whitworth, her superior, repeatedly and with unusual patience, extended time to her for preparing the reports.

From sometime in September, 1976, Ms. Ivey was on sick leave for ten weeks. In this period, the defendant offered testimony that it began to receive reports "about certain things that had not been done" by Ms. Ivey. Whitworth checked through Ms. Ivey's desk. He found "various things such as checks that were not deposited, dating back some four to five months; . . . rejected claims that had not been reprocessed, had not been sent back to the stores; . . . inquiries from managers that had not been answered . . . several instances where checks had been deposited in total without any breakdown as to what stores . . . could not support the breakdown on the spread sheet . . . used to deposit checks." When Ms. Ivey returned to work, Whitworth testified that he brought all of these delinquencies to her attention. Ms. Ivey offered various excuses. Her primary excuse was overwork and inadequate staff. How this pre-

vented her from preparing the monthly reports, depositing checks, answering inquiries from store managers, and the other shortcomings in her performance was not detailed by Ms. Ivey.

In line with its employment policy, Ms. Ivey's superiors reviewed with her at least two times before her demotion her job performance.[16] On each occasion, she was told by her superior that her performance was not adequate and did not qualify for an increase in pay. At this review her superiors indicated to Ms. Ivey the shortcomings in her performance. Ms. Ivey did not contest the shortcomings specified by her superiors in her performance. She sought again to excuse them because of inadequate staff and overwork. The last of these reviews was in April before her demotion. One of the items of discussion in both of these reviews was the continuing one relating to her failure to prepare her monthly reports. At her final April review, Ms. Ivey said she would have the reports by July next.

During the period when Ms. Ivey was supervisor Whitworth said he had repeated complaints from other departments about the noise and loud talking in Ms. Ivey's department. He had called this to Ms. Ivey's attention. Ms. Ivey generally blamed the noise on a white employee, Cindy Newsome. Whitworth told her she was the boss and she should control her employees. Further, he pointed out to her that she made as much noise as others in the department and she should set an example. Although Ms. Ivey seemed to blame her difficulties on Cindy Newsome, she never recommended either the discharge or disciplining of Newsome.[17]

**16.** The majority states that the defendant repeatedly complimented Ms. Ivey on her work. Such statement is incredible in the light of the record. On every occasion when the defendant reviewed the work performance of its employees as a basis for pay increases, Ms. Ivey was told by her superiors that she was not going to receive any increase in pay because her work was not adequate or satisfactory. And Ms. Ivey admitted this. There was no clearer way in which the defendant could have expressed its dissatisfaction with Ms. Ivey's performance than this. In the face of this undisputed evi-

dence, I simply cannot understand the statement in the majority opinion.

**17.** In her own testimony, Ms. Ivey sought to justify such failure by saying that she knew it would be unavailing since Newsome was a sister-in-law of Whitworth, the boss, though later she admitted that Newsome was related only to an exsecretary of the boss. Moreover, Newsome left the department sometime before there was a change in Ms. Ivey's status.

The district court attempted to give some racial coloring to this incident by comparing

In the meantime, the defendant had merged with another company engaged in a similar business but on a larger scale. The other company had a more sophisticated system for controlling "third party receivables" than had the initial employer and the merged company determined to shift over to the more sophisticated system operated by the other company. Whitworth, Ms. Ivey's superior, testified that, since Ms. Ivey had shown an inability to handle the simpler system used by the old company, it was obvious, Whitworth reasoned, she would not be able to handle the more sophisticated one.[18] He accordingly called Ms. Ivey in, explained the situation to her, told her he was going to transfer Ms. Wilkes from the accounts receivable department, where she was the second in command, to this new department as the supervisor. He offered Ms. Ivey the opportunity to transfer without any diminution in salary to another department, if the change embarrassed her. She declined, saying "that she and Marilyn [Wilkes] work well together."

I submit that this evidence offered by the defendant, so much of it undisputed by Ms. Ivey, met the test established in *Burdine* for articulating a legitimate reason for its action, and thereby shifted the burden to the plaintiff to prove by the preponderance of the evidence that "the proffered reason was not the true reason for the employment decision but pretextual" and that "she [had] been the victim of intentional discrimination."

Ms. Ivey assuredly did not thereafter satisfy her burden of persuasion that the articulated reason for Ivey's replacement was pretextual by any proof of a general practice of discrimination in promotion or demotions on the part of defendant, or by any evidence of discrimination in the treatment of black supervisors as contrasted with white supervisors, or by any record of harassment of the plaintiff Ivey. Thus, in its initial Memorandum of Decision, the District Court stated:[19]

"The court does not find that Ivey's demotion represents any general pattern, practice or policy regarding demotions. *There is no evidence that Ivey or any other class member who held a supervisory position was given more onerous duties or was held to a higher standard of performance than whites in comparable supervisory positions.* The Court would like to hear further from the parties on whether Almetta Ivey is, on these facts, entitled to any relief, and if so, what relief ought to be afforded." (Italics added)

What apparently the district court rested its finding on in this case was, first, that the defendant had not borne its burden of rebutting the claimant's *prima facie* case in that it had not established that Ms. Ivey's replacement was better qualified than Ms. Ivey. This proof of comparative qualification was essential, according to the district court, if the defendant were to sustain what the district court erroneously conceived to be the defendant's burden of persuasion.

the conduct of Whitworth in refusing to intervene in this case with that of Straughn in refusing to intervene by overruling supervisor Hart in the Brown case, later discussed. The conduct of Whitworth and Straughn was not inconsistent. The position taken by Whitworth was the same as that taken by Straughn: In both cases Whitworth and Straughn refused to intervene to overrule a subordinate supervisor or to direct the supervisor on how to direct those in the subordinate's department; the position taken in both instances that the action to be taken was for the subordinate supervisor and Whitworth and Straughn, as the supervisors' superiors, would not intervene to supersede the subordinates' supervisors' authority.

18. Whitworth's testimony on this point was:

"As I said, the reason I decided to change was because the work simply was not getting done under Ms. Ivey. I knew that the system we were getting ready to go on was much more detailed than the system that she had been unable to handle before. So I saw no reason why I could expect her to handle the more complicated system, when she couldn't handle the simple system we were on."

19. This Memorandum of Decision, entered a month or so after trial, was a statement of the District Court's conclusion. Thus, it began the Memorandum with this explanation:

"In accord with the foregoing, plaintiffs are directed to submit by June 30, 1978, proposed findings of fact, conclusions of law, and an appropriate order or orders."

In its initial *Memorandum of Decision*, the district court made this perfectly clear. It said:

"Although the system of accounting in the third party receivables department was changed in June, 1977, defendant did not demonstrate that Ivey was less capable of handling the new system than the new supervisor brought into the department. Her demotion was due, at least in part, to her race."

Later, in its subsequently entered findings of fact, the district court repeated this finding as the critical shortcoming in defendant's proof:

"Eckerd Drugs did not demonstrate that Ms. Ivey was less capable of handling the new system than her white replacement, and failed to demonstrate that Ms. Ivey's replacement was as, or more qualified, than Ms. Ivey."

I submit that the majority cannot successfully argue that the ultimate finding of the district court on this claim was not tainted or influenced by the district court's legal mistakes on both burden of proof and on the evidence on which a finding of racial discrimination in employment may be made. The majority admits that the district court incorrectly applied to the defendant a heavier burden of proof than *Burdine* allowed. Moreover, every time it found that Ms. Ivey's replacement was due "in part at least" to "race," it prefaced the finding by reciting that the defendant had failed to "establish," that is, to "prove," that the white replacement was as well as or better qualified than Ms. Ivey. That requirement of proof, thus noticed by the district court in this forceful fashion, was, as the majority again concedes, erroneous as a matter of law under *Burdine*. How, then, can it be fairly said that such erroneous finding of fact did not enter into and was not a factor—in fact, the deciding factor—in the district court's ultimate conclusion on the Ivey claim? Equally pertinent, how can it be fairly said that imposing on the defendant the burden of rebutting the claimant's *prima facie* case did not influence the decision in this case? Which party has the burden

of proof is often decisive in the resolution of a case. When that burden is illegally imposed on a party is not the decision tainted? I submit reversal is required in this case as much as, if not more so, than it was in *Ste. Marie v. Eastern R. Ass'n, supra,* in *Daye v. Harris,* 655 F.2d 258, 263 (D.C.Cir. 1981), and in *Piedmont Minerals Corporation v. United States, supra.*

While the failure of the defendant to prove that Ms. Wilkes was better qualified as a supervisor than Ms. Ivey apparently was a deciding factor in the district court's decision, two other circumstances were referred to in the district court's opinion. First, the district court states that Ms. Ivey trained Ms. Wilkes. We remark parenthetically that this statement, intended to point up the failure of the defendant to prove that Ms. Wilkes was as well as or better qualified than Ms. Ivey merely accentuated the effect of the district court's error of law upon its ultimate decision. But the validity of this statement factually was disputed vigorously by the defendant, and finds no real support in the record on careful analysis. Ms. Ivey certainly could not have trained Ms. Wilkes in the preparation of her reports which were essential for the control function of the department under the abandoned system: Ms. Ivey had never in all her months as a supervisor been able to prepare one. Moreover, the defendant was installing a new system, and Ms. Ivey had no familiarity at all with it and was in no position to train anyone in its operation. Actually, Ms. Ivey's testimony was not that she trained Ms. Wilkes but simply that as one who had been with the department from the beginning she explained "to Marilyn what goes on in the department." The district court, also, finds fault with the defendant for not giving Ms. Ivey until July to prepare and get in her first monthly report as a supervisor after approximately a year and a half in her job as a supervisor before demoting her as it did in June. However, the district court itself seems to have answered this claim. It found in the quotation from its *Memorandum of Decision* already quoted that "the system of accounting in the third party receivables

department was changed in June, 1977," when Ms. Ivey was replaced as supervisor. Any report under the old system would have been useless as a result of this change. There was no point in waiting for a report that had lost all relevancy. The decisive fact—and one not really disputed in the record—was that, in instituting a new and more complex system of controls in the department, it was reasonable to consider the inability, after experience for almost a year and a half, of Ms. Ivey to master the older, less complicated system and to conclude that her replacement was in order. The claimant Ivey offered no reason to find that such decision was unreasonable or pretextual or that it represented intentional racial discrimination. She had thus not met the burden of persuasion placed on her by *Burdine*.

Finally, it must be remembered that there is not the slightest evidence of any kind of racial prejudice on Whitworth's part in the entire period that Ivey was a supervisor under him. When the department was constituted, Whitworth could have appointed a white employee in the department as supervisor. He did not; he promoted Ms. Ivey. Never once did Ms. Ivey testify to any harassment on the part of Whitworth or any other superior because of her race. In fact, Whitworth, despite the fact that, as Ms. Ivey herself admitted, Ms. Ivey was not doing her job, struggled along with her, giving her repeated opportunities to improve. This certainly does not indicate that Ms. Ivey was being subjected to racial discrimination. I repeat: Though she had been supervisor for almost a year and a half, Ms. Ivey had never been able to prepare a single monthly report of the operation of her department. The report was not difficult to prepare; it involved a matter of simple addition which any eighth grade student should have been able to do easily. Ms. Ivey had been repeatedly told of her shortcomings as a supervisor and she did not dispute them. When the more sophisticated system was installed, Whitworth concluded he had gone as far as he could with Ms. Ivey. But—and this is something that demonstrates the absence of any intention

to be unfair to Ms. Ivey—Whitworth offered to transfer Ms. Ivey to any other department where she might think she could work more effectively and, in any event (whether she transferred or not) *she would continue to be paid her supervisor's salary*. She chose to remain in the department at her supervisor's salary. There is thus a complete absence of any racial connection with this episode. It can only be assumed that the district court reaches its conclusion because of its erroneous view of the burden of proof between the parties and because it considered proof that the replacement was as qualified as, or better qualified than Ms. Ivey, was essential if a finding of discrimination were not to be made against the defendant.

The individual claim of Ms. Ivey should have been dismissed by the district court which committed manifest error in ruling otherwise on the grounds assigned. Only if we are to disregard *Burdine* and our own case of *Ambush* can the claim of Ms. Ivey be affirmed. Frankly, I cannot understand the action of the majority in affirming the judgment in favor of Ms. Ivey, especially since *Burdine* so plainly compels reversal of the judgment in favor of Ms. Ivey.

### III

The plaintiff Brown's claim is no less lacking in merit than that of Ms. Ivey. She was employed by the defendant as a keypunch operator in the main office of the defendant and quit her job on June 3, 1975. It was the finding of the district court that "she quit her job under pressure from her supervisors" and it accordingly concluded that she had been constructively discharged. The doctrine of constructive discharge, relied on by the district court for its conclusion, is well recognized. It "had its genesis in the labor relations area (citing authority) but has been extended and held applicable to civil rights cases," *English v. Powell*, 592 F.2d 727, 731, n.4 (4th Cir. 1979). When properly proved, it is no different in effect than an actual discharge. In order to establish a constructive discharge violative of Title VII the plaintiff must prove by the

preponderance of the evidence that he was forced to quit his employment by reason of intolerable working conditions imposed on him by his employer, who was motivated in such imposition by racial or sex bias. *J.P. Stevens & Co. v. N.L.R.B.*, 461 F.2d 490, 494–95 (4th Cir. 1972); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981); *Cartwright Hdw. Co. v. N.L.R.B.*, 600 F.2d 268, 270 (10th Cir. 1979); *Muller v. United States Steel Corporation*, 509 F.2d 923, 929 (10th Cir. 1975).[20] A finding of "intolerable working conditions" under the doctrine is. not satisfied by proof that the employer was "very demanding of the employee" or that he "often dealt with [them] in a harsh manner;" such a finding "arises only when a reasonable person would find [the conditions] intolerable." *Johnson v. Bunny Bread Co., supra*, 646 F.2d at 1256. Moreover, the employer's imposition of "intolerable working conditions" must have been "taken with the intention of forcing the employee to quit" and not as a general employment policy. *Id.* at 1256. Nor will mere "isolated, casual, accidental or sporadic" harassment suffice to establish a constructive discharge; the doctrine requires a "concerted pattern of harassment," "so excessive and opprobrious as to constitute an unlawful employment practice under Title VII." *Carridi v. Kansas City Chiefs*, 568 F.2d 87, 88 (8th Cir. 1977); *EEOC v. Murphy Motor Freight Lines*, 488 F.Supp. 381, 384–85 (D.Minn. 1980). But—and this is the critical issue in the civil rights context—in order to render a constructive discharge remediable under Title VII, the intolerable conditions must also have been motivated by racial or sex bias. *Johnson v. Bunny Bread Co., supra*, 646 F.2d at 1256–57.

The doctrine of constructive discharge thus depends for its application in the civil rights or Title VII area on three specific findings: 1. That the employer imposed on the employee intolerable working conditions; 2. That the employer's action was taken with the intention of forcing the employee to quit; and 3. That his actions were motivated by a racial or sex bias. *Cartwright Hdw. Co. v. N.L.R.B., supra*, 600 F.2d at 270–71.

In its *Memorandum of Decision*, the district court predicated its factual finding of constructive discharge strictly on events occurring at "a conference on June 3, 1975, involving plaintiff, her immediate supervisor Penny Hart, the supervisor of all data processing operations John Strong (Straughn), and a personnel representative Glenda Hanner." The conference was called, according to this finding, "to discuss plaintiff's attendance record, her work performance and her attitude toward the company." "[T]empers were high on both sides" at the conference and, according to the district court, "[t]he treatment plaintiff received in the meeting would not have occurred had she been white; her conflict with her superiors was due at least in part to her race." There was no elaboration on these findings in the *Memorandum*, prepared by the district court. However, in the Findings later submitted by the plaintiffs and, as modified in a few particulars, adopted by the district court, the circumstances on which the district court made its finding of constructive discharge included some matters occurring before the conference of June 3rd.

The first of these earlier events cited in the later Findings was the refusal of the plaintiff's supervisor to change Ms. Brown's work station for "some three weeks after [her] initial request [for such change], even though she (Ms. Brown) told Ms. Hart she was having "difficulties with white employees," and "other operable work stations were available." Ms. Brown protested this decision over the head of her supervisor to the supervisor of all data processing operations, though, her supervisor told her later

---

**20.** As phrased in *Stevens*, the doctrine of constructive discharge, as applied in the labor relations area, was defined thus (461 F.2d at 494):

"Where an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job because of union activities or union membership, the employer has constructively discharged the employee in violation of § 8(a)(3) of the [National Labor Relations] Act."

she was a "fool" to have done this. The next incident in point of time was that the plaintiff "thought" herself referred to as a "nigger" on the day before the meeting of June 3 and that at the meeting Straughn at one time referred to the plaintiff as "girl." Finally, at the meeting on June 3, Ms. Brown claimed Ms. Hanner was misinterpreting her remarks during the conference. It is said that Straughn and Hart at that conference "insisted on [a promise of] absolute attendance" and the plaintiff promised "she would do her best to be at work, and not be absent every time her child was sick." The district court found that the plaintiff's "response was reasonable." Such were the findings on which the district court's conclusion of a constructive discharge rested.

I seriously question that the plaintiff made out a *prima facie* showing of a constructive discharge motivated by a desire on the part of the defendant to be rid of the plaintiff as an employee because of racial bias. Aside from that, however, the defendant clearly gave a lawful reason for every action taken by it, about which the plaintiff complains and gave the clearest evidence of an absence of racial harassment or discriminatory intent. Without so much as discussing any of these reasons as articulated by the defendant in its evidence, [and without later considering whether they were "pretextual,"] the district court dismissed them with the bare statement that the "defendant failed to rebut." It is obvious once again that the district court erroneously assumed that when the plaintiff made out a *prima facie* case the burden shifted to the defendant to disprove that *prima facie* case, and that if it failed then it had not rebutted the *prima facie* case. As we have already observed in connection with the Ivey claim, this assumption is contrary to the rule declared in *Burdine,* and, just as in *Ste. Marie v. Eastern R. Ass'n,*

*supra,* 650 F.2d at 398, this decision must be reversed for that reason.

Any review of the record in order to determine whether under *Burdine* the defendant articulated a lawful reason for its action, must begin with the undisputed fact that the plaintiff never in the first few months of her employment under her supervisor Hart and the over-all supervision of Straughn experienced the slightest harassment or evidence of either personal or racial bias, whether by her supervisors or by her fellow employees. Indeed, both Hart and Straughn, if anything, seemed to favor the plaintiff. As evidence of this is their treatment of Brown's request for maternity leave in early January, 1975. When told by Brown that she was pregnant within a month or so of her employment (of which they knew nothing when plaintiff was employed) and a request was made by plaintiff for maternity leave—a request which it was the policy of the defendant to refuse in the case of employees with less than a year of employment [21]—Ms. Hart on her own went to Straughn to request an exception in the plaintiff's case. And Straughn granted it. This certainly was a strong manifestation of the absence of any personal or racial bias against the plaintiff on the part of the plaintiff's supervisors. Further, there is no evidence of any racial bias in the department where the plaintiff worked. At the time of trial, Ms. Hart testified that half of the operators were black and one of her two assistants was black. This was undisputed. *If the defendant was employing blacks at this rate in the department, it is difficult to infer that the defendant, and particularly Ms. Hart and Straughn, had any aversion to employing blacks or had any reason to harass or fire the plaintiff or any other black employee simply because the employee was black.*

Turning to the first incident cited by the district court in its final Findings of Fact,[22]

---

**21.** The plaintiff testified that she did not know this was the policy of the defendant. However, the testimony of the defendant that such was the policy was undisputed. Moreover, it would not have been necessary for Ms. Hart to seek permission from higher authority in order to grant this leave to the plaintiff if there had not been such a policy.

**22.** The plaintiff's testimony of her complaint as stated to Ms. Hart on April 10th was:

—*i. e.*, the failure to reassign the plaintiff to another work station—the defendant gave a very reasonable explanation of the action taken. The plaintiff made her first request for a reassignment on April 10. Ms. Hart told her that she expected shortly to make a complete reassignment of all the employees and would at that time take care of the plaintiff's complaint. This was the common way for Ms. Hart to deal with such situations.[23] The plaintiff said that was "acceptable" to her. On the 16th, however, Ms. Brown complained again to Ms. Hart and Ms. Hart, according to Ms. Brown's testimony, replied that she would "not change [the plaintiff's] desk until she changed everybody's." Ms. Brown responded that "if she would not change my desk this time, that I would go to somebody that would."

Ms. Brown went to the office of Mel Harvey, who told her he had no authority to direct the change and referred her to Straughn. Straughn, however, refused to overrule Ms. Hart, saying that "if he had to come in and change [Ms. Brown's] desk he would have to come in and take over her office and he did not intend to do that." Ms. Brown's answer to this was, as she herself testified, "Okay, I'll go back there, but don't expect me to put out one hundred per cent." In her statement as given to the EEOC the next day, her response was given as: "Well, I said, I'll go back in there and I'll sit at the same desk, but don't expect me to put out a hundred percent." Ms. Brown then testified that Straughn told her, "You'll go back in there and put out a hundred percent or else", to which Ms. Brown replied, "[t]hen I said, or else I'm not going to quit my job, you'll have to fire me." Straughn inquired whether Ms. Brown was giving him an ultimatum. Ms. Brown's reply was: "I said, no, you said that."

The plaintiff thereupon returned to her job but the next day, April 17 she left work at 1:50 p. m., claiming sickness. However, she went that afternoon to the local EEOC and complained.[24] She testified that from this time on, she kept a detailed account of any complaints she might have in connection with her employment while she was working. She returned to work on Friday, April 18. The plaintiff was absent from work all of the following week, returning to work on April 28. On April 29, Ms. Hart made the general reassignment of stations among the employees, including "the plaintiff," which Ms. Hart had previously told the plaintiff she was preparing to do.

The defendant, through its witnesses, filled in a considerable amount of material on this incident. There was no dispute that a Ms. Baker and the defendant had some conflicts and that Ms. Baker was white and the plaintiff black. But there is nothing in the record to suggest that those differences arose out of any racial conflicts or involved any racial slurs. There were many blacks in the department. So far as the record shows, Ms. Baker had had no trouble of any kind with any other black employee in the department. The difficulty between Brown and Baker appears to have been merely a personality conflict between the two. Moreover, Ms. Hart explained in her testimony her reason for not immediately granting the plaintiff's request. First, the plain-

"A. I just told her [Ms. Hart] that there was constantly bumping me and I had made Mary [her neighbor at work] aware of it and she was still doing it and I asked her if I could take one of the empty desks.

"Q. Okay, and she said she would change your seat around when she changed the whole office, but that she couldn't do that in the middle of the week, right?

"A. She said that she would change my desk around when she changed the whole office, period.

"Q. You said, 'Well, okay, that's acceptable.' right?

"A. Yes, I did."

23. Ms. Hart testified "[i]t was my custom to do this [move everyone around] to break up people that did not get along or people that get along too well that it hampered their work habits. I moved everyone at the same time."

It was a practice uniformly followed by Mrs. Hart and applied equally to both black and white employees.

24. Neither the plaintiff nor the EEOC notified the defendant of this complaint until just before this suit was filed.

tiff wished to be assigned to a particular station occupied by another employee. Secondly, there were, as the plaintiff testified, a few stations unoccupied. The machines at some of these stations were inoperative; the others were not serviceable because of their remote location (the operator was required to look always at the wall.) In Ms. Hart's opinion, the whole problem could be better remedied by the general reassignment being developed by her at the time. This was her general rule when difficulties arose between employees.[25] The plaintiff indicated this arrangement was acceptable to her. When the plaintiff renewed her request on the 16th, Ms. Hart gave her the same answer. The plaintiff responded by going over Ms. Hart's head and, then, when her request was denied, by threatening her superiors with a work slowdown. The conduct of the plaintiff was, by any standard, insubordinate, warranting severe discipline. The defendant, by its conduct, clearly established that it was not seeking to force the plaintiff to quit (if it had such an intention, it had ample justification for discharge in the plaintiff's conduct) and there is no intimation of any racial motive in defendant's action. Moreover, the defendant gave a perfectly reasonable explanation for its action, which accorded with its established practices.

The second incident listed by the district court was the alleged use of the term "nigger" in a conversation of Straughn on June 2 before the final incident on June 3. Straughn denies any such use of the term. The plaintiff claims to have overheard Straughn use this term in a conversation with certain persons. She recalls no other language used in the conversation nor could she give any account of the conversation; she claimed only to have heard the one word. She had no recollection of the context in which it was used. But she merely "thought" it must have referred to her

since she was the only black nearby at the time.[26] Though the plaintiff had at the time been working at the defendant's office for some six months, she testified to no other occasions when she asserted she had heard anyone use the word "nigger" and certainly she testified to no racial slurs that had been directed to her by any fellow employees or by her superiors. In *Johnson v. Bunny Bread Co., supra*, the plaintiff, asserted a constructive discharge based on harassment consisting largely of racial slurs. The Court, in dismissing the claim said (646 F.2d at 1257):

> "We find no steady barrage of opprobrious racial comment. The use, if any, of racial terms was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward appellants. '[M]ore than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions.' ... Such racial slurs as were present at Bunny Bread were largely the result of individual attitudes and relationships which, while certainly not to be condoned, simply do not amount to violations of Title VII."

Certainly the evidence in this case is a "far cry" from that in *Bunny Bread*. At best, there was a single "accidental" or "sporadic" use of the term "nigger" and the context in which it was used is not indicated. Apparently, if used, it was used as "merely part of casual conversation." There is no evidence that the term, if used, had any reference to the plaintiff. Even the plaintiff merely says she "thought" it referred to her. This single episode, if it did occur, representing the utterance of a single racially objectionable comment heard by the plaintiff over the entire period of her employment by the defendant cannot amount to that degree of harassment which will

---

**25.** See note 23.

**26.** The majority incorrectly states that Ms. Brown was referred to as a "nigger" by Straughn. That does not accord with the record, and the district court corrected the proposed Findings of Fact as submitted by plaintiffs' counsel on this point. Ms. Brown testified that she did not know whether the term referred to her but she "thought" it did, even though it was in no way addressed to her.

support a finding of constructive discharge because of racial bias.

The final circumstance relied on for a finding of constructive discharge occurred at the conference with the plaintiff on June 3. The defendant amply proved a lawful reason and justification for this session with the plaintiff. Since the first of the year, the plaintiff had been absent from work on at least four occasions. From January 7 until April 7, she, in effect, was on maternity leave. When, on April 16 she was denied a reassignment of station, she took off from April 17 until April 28. Two and a half weeks later she took off on May 15, 16 and 19. She claimed that Ms. Hart suggested she take off but Ms. Hart denied this; and the record suggests no reason why Ms. Hart should have made any such suggestion. Again, on May 28, 29 and 30, the plaintiff was absent from work. When she returned to work on June 2, Ms. Hart inquired of the plaintiff why she had been absent and was told that her child had been sick on some bad milk she had purchased at an Eckerd's store. The plaintiff demanded that she be paid for the days she had been off. Moreover, there is no dispute that the plaintiff had, since April 16, when she threatened that she wasn't going to put out "one hundred per cent," committed a large number of errors in her work. The plaintiff later attempted to explain these errors by claiming that the computer programs had been changed while she was absent and Ms. Hart had refused to help her adjust to the changes. Ms. Hart denied any such request for help. Whether Ms. Hart was correct in her testimony or not, the fact is that the plaintiff was guilty of an excessive number of errors. Finally, the defendant was concerned about the plaintiff's attitude to her work. Though not known to the defendant, the plaintiff had already filed a complaint with the EEOC. This was an obvious expression of her dissatisfaction with her job. She had already demonstrated insubordination and defiance of authority. There was thus abundant justification for a discussion with the plaintiff of her absenteeism, poor work, and general work attitude. This evidence met the test for the articulation of a lawful reason for the conference.

At the conference, Straughn and Ms. Hart sought some commitment from the plaintiff of improved work attendance. The plaintiff's excuse for absenteeism appears to have been generally the need to stay home with her child. Ms. Hart and Straughn inquired into the arrangements she had made for taking care of her child while she worked. Discussion turned to minor ailments of the child. The two sides differ somewhat on what Ms. Hart and Straughn wanted in the way of a commitment from the plaintiff about future absenteeism. There can be no question that Ms. Hart and Straughn were seeking a promise from the plaintiff of better attendance. The plaintiff claimed Ms. Hart and Straughn wanted an absolute commitment of no absence. This does not seem borne out by the record, since, if this were the case, there would have been no occasion for the difference between her child's minor sicknesses and serious sicknesses which developed in the discussion. The plaintiff's absenteeism was excessive by any standard and the defendant had a perfect right to request a promise of improvement by the plaintiff. The plaintiff, however, does not seem to have taken kindly to the criticism directed at her. Tempers arose on both sides. Straughn at this point brought Ms. Hanner into the conference, thinking that a new person who had had no previous acquaintance with the problem might mediate the difference. Ms. Hanner's presence appears to have had the reverse effect. According to the defendant's witnesses, when Ms. Hanner indicated some agreement with the position taken by Ms. Hart and Straughn, the plaintiff dismissed Ms. Hanner, saying that it was obvious she was "on the side of the whites." The plaintiff's version was that Ms. Hanner offended her by Ms. Hanner's "terminology" in restating the plaintiff's position. Apparently what she was suggesting was that Ms. Hanner was subtly disparaging the plaintiff's expressions, as typical racial language, *though the defendant, despite considerable effort to do so, was unable to extract from the*

*plaintiff any statement of Ms. Hanner that could reasonably support such an inference by the plaintiff.* Whichever version is accepted, it is clear that this was the first time in all the encounters between the plaintiff and her superiors that anything racial had been injected into the relationship and it was injected by the plaintiff. Ms. Hanner's reaction was to state that she had not understood that this conference represented "a white-black situation." With this, the plaintiff demanded either that a black or her lawyer be brought into the discussion, Ms. Hanner explained there was no black supervisor available and that she did not think it fair to bring a fellow employee into the discussion. The plaintiff then turned her back on the others and refused to talk. Ms. Hanner said that if the plaintiff was unwilling to talk to her, Ms. Hart and Straughn, perhaps she would be happier working elsewhere. With that, the plaintiff uttered, according to the defendant's witnesses, an obscenity and walked out.

Such was the testimony on which the district court made its finding of a constructive discharge. As I have already said, the record was not, in my opinion, sufficient to make out a *prima facie* case of constructive discharge remediable under Title VII, but, whether it was or not, the defendant had made a sufficient rebuttal under the *Burdine* rule to shift the burden of persuasion to the plaintiff to establish by the preponderance of the evidence that the plaintiff had been forced by "intolerable working conditions" imposed by the defendant on the plaintiff with the motive and purpose of forcing the plaintiff to quit because of the defendant's racial bias. The plaintiff made no real effort to show upon the shift of the burden of persuasion to her that the defendant's explanation of lawful motive was pretextual and that the constructive discharge was the result of intentional discrimination. There simply was no attempt either by the plaintiff or by the district court to follow the rule in *Burdine*, even though, as Judge Friendly observes in

*Ste. Marie*, this principle had "been clear ever since *McDonnell Douglas*,"[27] nor, for that matter, was there any attempt to comply with it in the majority opinion. In fact, the majority opinion simply sweeps the doctrine "under the rug" and, without any review of the record or of the defendant's evidence (an error which was equally true of the district court), affirmed the plaintiff's claim on the district court's finding under the clearly erroneous rule. I submit *Burdine* requires more of us as well as of the district court.

The record in this case provides not the slightest basis for a finding of a constructive discharge violation of Title VII. The repeated evidence of consideration for the plaintiff by her superiors demonstrates conclusively that the defendant was not seeking to force the plaintiff to quit or to impose on her intolerable working conditions. The plaintiff's superiors bent the rule on maternity leave to give special treatment favoring the plaintiff. Even as the plaintiff details the facts, the only time the plaintiff experienced any difficulties in her job was for a period between April 10 and April 16, when the defendant refused to change her work station. There is, however, not any evidence that, in refusing to make this change for the plaintiff, the defendant was acting any differently from its usual treatment of such requests. Further, whatever difficulties the plaintiff may have had with Ms. Baker (who, incidentally, was smaller than the plaintiff) were free of any racial aspects. I assume this because the plaintiff testified to none. Moreover, if the defendant had any covert desire to rid itself of the plaintiff as an employee, the plaintiff provided the defendant with the perfect justification for firing her. One may find it difficult to understand why Straughn did not fire the plaintiff on April 16 when she threatened him that she was not going to give a "hundred percent" to her job. Later, the plaintiff's absenteeism and work errors were excessive and the defendant cannot be faulted for requesting of the plaintiff more attention to her job. When any racial over-

**27.** 650 F.2d at 399.

tones were introduced into the conference, they were introduced by the plaintiff. I submit, with all deference for the views of my fellow panel members, that there is insufficient evidence to make out a *prima facie* case of constructive discharge and, were there such evidence, the defendant articulated lawful reasons for its actions and, contrary to the district court's conclusion, it rebutted the plaintiff's *prima facie* case and the burden of establishing her claim shifted back to the plaintiff under *Burdine.* The plaintiff made no effort to take up her burden of showing that the reasons given by the defendant were pretextual and a cloak for intentional discrimination. Accordingly, this individual claim of constructive discharge, just as Ms. Ivey's claim, should be dismissed; and, since the findings on which the decision rested were tainted by legal error on the burden of proof, that decision cannot be affirmed under the clearly erroneous rule. *See Owen* and *Piedmont Minerals, supra.*

IV

The affirmance of the district court's decision on the class action aspect of the proceeding is, in my opinion, as manifestly erroneous as the affirmance of the decision on the individual claims of Ivey and Brown. In affirming the class action part of the decision, the majority proceeds on the assumption that Brown and Black (and only Brown and Black) were appropriate representatives of the entire class certified by the district court; it expressly refused to consider the claimant Ivey as a proper class representative as a result of her post-trial intervention. In short, then, the propriety of the class certification and the class relief depends on the qualification of Brown and Black as class representatives for the class certified by the district court.

Both Brown and Black had been hired by the defendant and had worked for some time for the defendant; both had been discharged. Their individual claims were accordingly that their *discharges* had been tainted by racial bias and that only. Over the defendant's objections, the district court

(by an order dated March 3, 1977), tentatively certified in reliance on *Barnett v. W.T. Grant Company,* 518 F.2d 543 (4th Cir. 1975), Black and Brown as proper class representatives to prosecute the action on behalf of a class consisting of:

"The class shall consist of plaintiff and all blacks in the Mecklenburg County facilities of defendant and its wholly owned subsidiary, Eckerd Providence, Inc., who have since January 18, 1975, or may have been affected by discrimination by defendant Eckerd Drugs, Inc. or its wholly owned subsidiary Eckerd Providence Inc. on the basis of race in connection with hiring, promotion, termination, job assignment, and geographical assignment; the class includes all blacks so affected who (a) are currently employed by defendant Eckerd Drugs, Inc. or its wholly owned subsidiary Eckerd Providence, Inc.; (b) have been employed by defendant Eckerd Drugs, Inc. or its wholly owned subsidiary Eckerd Providence, Inc.; since January 18, 1975, and have been terminated or otherwise left defendant Eckerd Drugs employment; or (c) have applied for employment with defendant Eckerd Drugs, Inc. or its wholly owned subsidiary Eckerd Providence, Inc. at any time since January 18, 1975 and were denied employment."

On May 24, 1977, it finally certified the class as described in its tentative order of March 3. Later, on July 26, 1979, after this Court decided *Hill v. Western Elec. Co., Inc.,* 596 F.2d 99 (4th Cir. 1979), *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186, the district court amended its certification by eliminating from the class certified all "[a]pplicants for initial employment" as described in paragraphs 16 and 18 of its *Memorandum of Decision.* Further, in its *Memorandum of Decision* itself, the District Court had found that the plaintiffs had "not established any general discriminatory pattern or policy as to discharges, layoffs, demotions, pay or working conditions." Later, in its Findings of Fact, entered in support of its *Memorandum of Decision,* the District Court confirmed its finding that no pattern of discrimination had been proved

"as to discharges, layoffs, demotions, pay or working conditions," and dismissed any claims of persons claiming discriminatory failure to hire because such persons failed to qualify as class members. Thus, the only class members found to be entitled to relief were "[c]lass members who have claims for promotion and transfer into management or supervisory jobs at any of the facilities" involved. In essence, then, the only class claims in this case relate to promotions, nothing more.

*Hill* made it the rule of this Circuit that a named representative " 'must possess the same interest[s] and suffer the same injury' as the class members they seek to represent." [28] Thus, one who is employed may not represent as a class representative those who were not hired. The district court recognized this and held that the named representatives in this case, both of whom had been employed, could not represent as a class representative persons who claimed discrimination in hiring. The majority affirms this ruling and I assume agrees with the district court's ruling. But the district court held and the majority on this appeal agrees, that employees who never requested or sought promotion or who made any claim to a promotion but whose sole claim is that they were discriminatorily discharged can represent the class of employees who were denied promotion. This, I submit, is clearly contrary to *Hill*. I, accordingly submit that the plaintiffs in this case were no more qualified under *Hill* to represent the class of persons denied promotion than they were to represent the class of persons not hired.

The majority, however, declares that *Hill* "did not preclude an *employee* who suffers *some* particularized employment discrimination grievance from representing other employees who present factually differing claims that, nevertheless, proceed on the same legal theory of race discrimination" and its proceeds to resurrect *Barnett v. W. T. Grant Co., supra,* 518 F.2d 543 as authority for this. The language used by the majority, it is true, is an accurate statement

of the ruling in *Barnett* but it most emphatically is not a formulation of the ruling in *Hill.* As a matter of fact, *Hill* very plainly overruled *Barnett* on the very ruling stated by the majority. In *Hill,* the plaintiffs-employees sought to proceed on the same legal theory of race discrimination as did the plaintiffs here (*i. e.,* "that the company had engaged in a pattern of discrimination against blacks and females in hiring, in job assignments, and in promotions to salaried and supervisory positions in its facilities in Arlington, Virginia)" [29] and to represent as a class representative all blacks and females discriminated against as a result of such broad claim of "race discrimination." The actual discrimination suffered by the plaintiffs, however, related to promotions. The Court in *Hill* said unequivocally that *East Texas Motor Freight v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) had limited the rule stated in *Barnett,* declaring that:

> "What is left of *Barnett,* however, is not broad enough to permit a named representative to represent a class of people who suffered different injury or those having similar claims but who are employed in other facilities." [30]

Specifically, thus, we held in *Hill* that the plaintiffs in that case could represent as a class representative only that class of employees who had "suffered injury in precisely the same way in the denial of promotion," but they could not represent as class representative employees suffering discrimination of another type, such as hiring.

In fact, the construction given the opinion of the Supreme Court in *Rodriguez,* by *Hill* had already been suggested by this Court by way of dictum in *Shelton v. Pargo, Inc.,* 582 F.2d 1298, 1312–13 (4th Cir. 1978), particularly n. 53, and *Belcher v. Bassett Furniture Industries, Inc.,* 588 F.2d 904, 906, n. 3 (4th Cir. 1978). And in *United Black Firefighters of Norfolk v. Hirst,* 604 F.2d 844 (4th Cir. 1979), we subsequently reached the same result and applied the same rule

**28.** 596 F.2d at 101.

**29.** 596 F.2d at 100.

**30.** 596 F.2d at 102.

as in *Hill.* In that case, the plaintiff asserted an "across-the-board" discrimination claim involving "recruiting, hiring, job classification, assignment, promotion, transfer, layoff, recall, discipline, discharge, benefits, training programs, compensation, testing, and condition of employment." However, the only specific complaint of the representative plaintiffs was one "of discrimination in promotion."[31] The Court refused to certify and on appeal we held, quoting from *Rodriguez,* that "[s]o far as the applications are concerned, the class action was properly rejected. Three named employees-plaintiffs have stated claims of discrimination in promotion. On remand the court should determine whether the employees-plaintiffs may represent as a class those who are similarly situated.[32] Thus, though the complaint in that case alleged an "across-the-board" discrimination claim, the court held that, since the only named plaintiffs with a discrimination claim were employees complaining of discrimination in promotion, the only class that could be certified was one having a claim of denial in promotion. Accordingly, before *Hill,* we had declared the same rule as was enunciated in *Hill,* albeit by way of dicta in *Shelton* and *Belcher,*[33] and *after Hill,* we had declared and followed in *Hirst* the rule as enunciated in *Hill.*

I would not be misunderstood. I do not suggest that the application of *Rodriguez* as stated in *Hill* is the only one that has been adopted by the Courts of Appeals. I recognize that there are two lines of authority on the issues. These two lines of authority with their different approaches to *Rodriguez* were marked out with precision in *The Proper Scope of Representation in Title VII Class Actions: A Comment on East Texas Motor Freight System, Inc. v. Rodriguez,* 13 Harv.C.R.–C.L.L.Rev. 175 at 177 (1978). The author identified the first as the "across-the-board" rule, under which "plaintiffs who alleged 'across-the-board' " "racial discrimination [are] permitted to represent all persons, however situated, who were affected by an employer's discriminatory policies." Under the other approach, known as the "same impact" doctrine, "only those suffering the 'same impact' as the plaintiff—for instance, a discriminatory refusal to hire—could properly be considered members of the plaintiff's class." *Id.,* at 177. Courts are in dispute with respect to which approach expresses the majority construction of *Rodriguez.*[34] That argument, it appears to me, is unimportant for us. *Hill* and *Hirst* have committed us to the "same impact" approach. And this is the way in which the other Circuits have construed the rule in this Circuit. Thus, in *Falcon v. General Tel. Co. of Southwest,* 626 F.2d 369,

---

31. 604 F.2d at 846.

32. 604 F.2d at 848.

33. *See, also, Doctor v. Seaboard Coast Line R. Co.,* 540 F.2d 699 (4th Cir. 1976).

34. In *Vuyanich v. Republic Nat. Bank, Dallas,* 505 F.Supp. 224, 235–6, (N.D.Tex.1980), the Court discusses the two lines of authority, states that *Falcon* represents the rule in the Fifth Circuit, but adds: "The Fourth Circuit has reached a contrary result, *Hill v. Western Electric Co.,* 596 F.2d 99 (4th Cir.) *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979) . . . ." It then lists in footnote 10 a number of district court decisions reaching contrary conclusions on this point.

However, in *Fields v. Village of Skokie,* 502 F.Supp. 456, 460–61 (N.D.Ill.1980), the court said:

"Whether on Article III grounds or applying *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52

L.Ed.2d 453 (1977), most Courts of Appeal that have considered the issue have held that a plaintiff employee who challenges an employer's discriminatory promotion practices may not represent a class complaining of discriminatory hiring practices because such claims are insufficiently similar. *Hill v. Western Electric Co., Inc.,* 596 F.2d 99, 101–2 (4th Cir. 1979) *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1980); *Chavez v. Tempe Union High School Dist. 213,* 565 F.2d 1087, 1094, n. 10 (9th Cir. 1977); *accord, Scott v. University of Delaware,* 601 F.2d 76, 87 n.23 (3d Cir. 1979), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1980); *cf. Tuft v. McDonnell Douglas Corp.,* 581 F.2d 1304, 1308 (8th Cir. 1978) and *Walker v. World Tire Corp., Inc.,* 563 F.2d 918, 922 (8th Cir. 1977). This Court does not agree with the minority view of the Fifth Circuit, *Falcon v. General Telephone Co. of the Southwest,* 626 F.2d 369 (5th Cir. 1980)."

375 (5th Cir. 1980), *Hill* is cited as stating the rule in this Circuit. The same is true in *Vuyanich v. Republic Nat. Bank, Dallas, supra,* 505 F.Supp. at 235–36 and in 82 F.R.D. at 433, n. 8. In fact, no court has suggested that the rule in this Circuit is different than as expressed in *Hill.*

I feel compelled, however, to say that I perceive in the majority opinion and in other opinions in the wings a disposition to overturn or at least erode the ruling in *Hill* by drowning it in interpretations contradictory of its clearly expressed holding. One evidence of this is the resurrection of that part of *Barnett,* which was specifically found in *Hill* to be contrary to *Rodriguez.* It is obvious, I submit, that *Hill* and *Barnett* both cannot stand and, if precedent is to have any meaning in our collegiate court, one or the other of these cases must be followed. Since *Hill* is our latest expression and declared *Barnett* no longer the law of this Circuit, I would assume we should follow *Hill,* until it has been overturned in the proper way.

Along this same line, I think it unfortunate that, in attempting to resolve whether an employee with a special grievance can qualify as a class representative of an across-the-board class, we look to pre-*Rodriguez* Circuit or District Court decisions. There can be no question that *Rodriguez* represented a watershed decision on this point. The article in the Harvard Civil Rights-Civil Liberties Law Review, cited by the majority, recognizes this.[35] Moreover, as we have seen, there are decisions subsequent to *Rodriguez* which take the same view of that decision as we did in *Hill* and others such as *Falcon,* cited by the majority, which take a contrary view. I, however, find it somewhat odd that the majority cites and follows *Falcon,* when that decision points out that the rule in this Circuit as stated in *Hill* is contrary to that taken in *Falcon.* It is normal practice to look to decisions of other circuits for guidance on subjects on which our circuit has not expressed itself and, as I have said, I think it unusual that, when we have a number of decisions—not simply *Hill,* but *Hirst,* as well, and in addition several dicta in other decisions—we should look to contrary decisions of another circuit for guidance.

There is another suggestion in the majority opinion I find disturbing. The right of the two named plaintiffs to represent a class complaining of promotion discrimination, even though the named plaintiffs' own grievance is discriminatory discharge, is said to exist because, if the named plaintiffs are reinstated, they could at some future time possibly suffer discrimination in promotion. Such a suggestion is no more than saying that any employee, even though he has no individual grievance, may maintain a class action charging "across-the-board" discrimination. I find such a suggestion a plain violation of the whole structure of Title VII. That Title not merely contemplates, it expressly requires, that a plaintiff under that Title, have an individual complaint and assert an individual grievance. And the defendant is entitled to notice of that individual grievance and to an opportunity to conciliate. These are not empty gestures as the Second Circuit made plain in the recent case of *E. E. O. C. v. Sears, Roebuck & Co.,* 650 F.2d 14, 18–19 (2d Cir.

---

35. The majority cites this student Comment in support of its view of *Rodriguez* in contradiction of that stated by us in *Hill.* What the writer in this Comment is really arguing is, not so much that the construction of *Rodriguez* in *Hill* was wrong but that the Supreme Court itself was wrong in *Rodriguez.* This is plain in the first sentence in the Comment's concluding statement: "It is difficult to justify the result reached in *Rodriguez.*" *Id.* at 199. The Comment titled *Class Standing and the Class Representative,* 94 Harv.L.Rev. 1637, 1642 (1981), is likewise an argument against the decision in *Rodriguez.*

I recognize the right of writers in Law Reviews to criticize and differ from the decisions of the Supreme Court but I submit that is a privilege not allowed Courts of Appeals or District Courts in the federal judicial system; it is our duty to follow the decisions of the Supreme Court until those decisions are reversed by the Supreme Court, *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 226 (1975), and that is precisely what we sought to do in *Hill.*

1981). These requirements of the statute just won't jibe with this suggestion in the majority opinion. Further, I have difficulty in finding how this suggestion can be reconciled with the Article III requirement of an actual, live controversy between the plaintiff and the defendant.[36]

Equally open to objection is the suggestion that it is of no moment whether certification was authorized or not, if the discrimination claim has been tried and discrimination found. It would be a waste of judicial time, it is argued, to reverse under these circumstances, thereby necessitating a new case and a new trial with a new plaintiff in order to redress what Congress has found to be a public evil. We all will agree that discrimination is a public evil, but this does not mean that sound rules of procedure as mandated by Rule 23 are to be abandoned in individual (as distinguished from EEOC) discrimination cases. What this suggestion means, I submit, is that district courts should give only perfunctory consideration to certification requirements in these discrimination cases, should tentatively certify them *pro forma*, should try the case and, if discrimination is proved, any error in the certification is thereby cured. This is a procedure not approved in *Hill* and *Hirst*. In both *Hill* and *Hirst* there had been a trial but that fact didn't prevent the court from reversing the judgments in both cases because of error in the certification. At least one commentator, however, has found that in *Stastny v. Southern Bell Tel. & Tel Co.*, 628 F.2d 267, 277 (4th Cir. 1980), we held "that *Rodriguez* does not apply to pretrial

certification orders." Karro, *The Importance of Being Earnest: Pleading and Maintaining a Title VII Class Action for the Purpose of Resolving the Claims of Class Members*, 49 Ford.L.Rev. 904, 943 (1981). I think the commentator has mistaken our holding in *Stastny.* Certainly the requirements of Rule 23 are just as applicable to discrimination cases as to any others and this was as true before *Rodriguez* as after *Rodriguez.* It was expressly so held in *Rodriguez.*

Nor is certification ever a perfunctory act, as the majority seems to assume. We have made this crystal clear in a number of cases, *Doctor v. Seaboard Coast Line R. Co., supra,* 540 F.2d at 706–07; *Windham v. American Brands, Inc.,* 565 F.2d 59, 64, n. 6 (4th Cir. 1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58; *Shelton v. Pargo, Inc., supra,* 582 F.2d at 1312–15; *Belcher v. Bassett Furniture Industries, Inc., supra,* 588 F.2d at 906. Of these, *Shelton v. Pargo* reviews the issue in considerable depth. To follow a view that it is irrelevant whether certification was proper or not if discrimination at trial is later established would mean that Rule 23 would be without meaning or effect and would be just a jumble of words stated in hypocritical mandatory terms. District Courts could at their discretion proceed on the bare allegations of the complaint and, whether certification was proper or not, the subsequent class trial will not be reversed if class discrimination is found. That certainly, I submit, is not the law of this Circuit nor does it accord with the best thought on the subject.[37] It is, of

---

**36.** *See Bailey v. Patterson,* 369 U.S. 31, 32–33, 82 S.Ct. 549, 550, 7 L.Ed.2d 512 (1962), as discussed in 84 Harv.L.Rev. at 1639, *et seq., supra.*

**37.** In *Shelton, supra,* we cited and discussed a monograph prepared under the auspices of the Judicial Center and authored by the leading scholar in the area of class actions, Professor Arthur Miller. In line with the language of Justice Stewart in *Rodriguez,* he repudiated any notion that certification under Rule 23 was ever a perfunctory matter. He declared that, in certifying a class, the Rule required at least seven specific findings of fact, which, in the normal case, could only be made on the basis of some inquiry into the facts of the case. All

of this careful procedure, as outlined by Professor Miller and as adopted by us in *Shelton* and as declared in *Rodriguez,* would be nullified by any rule of perfunctory certification merely because a claim of racial discrimination was asserted. It may be that, following the procedure outlined by Professor Miller would mean that a trial in an erroneously certified class action might be aborted, despite a finding after trial that there had been class discrimination. This might be regrettable but it is not a proper justification for setting aside the clear requirements of Rule 23 any more than the ultimate result in *Ste. Marie, supra,* was any justification for disregarding the procedure mandated in *Burdine.* If the mandatory requirements of

course, regrettable that the trial is aborted but this is no more unfortunate than the reversal of the judgment on the merits in *Ste. Marie v. Eastern R. Ass'n, supra,* 650 F.2d 395, because the district court had not followed the procedure declared in *Burdine.*

The plaintiffs in this case have sought to find support in our decisions of *Cox*[38] and *Goodman,*[39] for the right of Brown and Black, neither of whom had any claim of discrimination in promotion, to represent a class asserting such claim. Both of these cases preceded the decision in *U. S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), while the Circuit and District Courts were still struggling with the so-called "headless" class action, in which the individual claim of the class representative had been dismissed. That situation prompted the argument that the class action itself should be dismissed if, on appeal, it was determined the individual claim of the class representative was meritless. It must be noted at the outset, though, that in those cases the class representative had alleged properly an individual claim and that the class of which he had been certified as a class representative was composed strictly of those with a like claim to that of the class representative. There was thus no defect in the certification. The question was whether the loss, after trial, of his individual claim, required the dismissal of the class action. We felt it was contrary to the policy of Title VII to dismiss the perfectly valid class certification under those circumstances and so we formulated

the rule that, in such a case, we would hold the case in abeyance for a reasonable time in order to give some proper class representative a reasonable opportunity to come forward and replace the original class representative.

But—and this is the point the plaintiffs overlook in discussing *Cox* and *Goodman* : we only extended the opportunity to intervene to persons who had a similar claim of discrimination to that of the original plaintiff; there was no opportunity to enlarge by way of a belated intervention the class to present any discriminatory claim other than that asserted by the original plaintiff. That was made perfectly plain in *Goodman* where, in remanding the action, we instructed the district court that the action should "be retained on the docket for a reasonable time to permit a proper plaintiff or plaintiffs, *with grievances similar to those of Goodman, Debrew, or Mrs. Martin,* in person, to present himself to prosecute the action as a class representative" (Emphasis added).[40] *Geraghty* made it unnecessary to go through this procedure, since it held that, after certification, the class representative presents two claims, one being his individual claim and the other his class claim, and the dismissal or mootness of the individual claim will not moot the class claim; the class representative may continue to press his class claim but only the class claim which he can properly assert, *i. e.,* one asserting a discrimination suffered by him.[41]

the Rule are to be disregarded and set at naught because we think a correct result has been reached despite the plain violation of the Rule before trial, there is no point in having any Rules. I cannot believe the majority would subscribe to such a principle. Certainly, we did not follow any such principle in *Hill* and *Hirst.*

**38.** *Cox v. Babcock & Wilcox,* 471 F.2d 13 (4th Cir. 1973).

**39.** *Goodman v. Schlesinger,* 584 F.2d 1325 (4th Cir. 1978).

   A like case is *Simmons v. Brown,* 611 F.2d 65 (4th Cir. 1979).

**40.** 584 F.2d at 1332–33.

   This exact language as used in *Cox* and *Goodman* was repeated in *Simmons,* 611 F.2d at 67.

**41.** The majority seems to find something in *Geraghty* inconsistent with *Rodriguez.* There is no inconsistency. The two decisions dealt with two entirely different questions. *Rodriguez* involved the question whether a plaintiff who had *not* suffered injury like that of the class he sought to represent could be a proper class representative under Rule 23 and Article III. That is our question and it was decided in the negative, which is what I submit should be the decision in this case. In *Geraghty,* however, the plaintiff had suffered the same injury as that asserted in the class claim both *at the time he filed his suit and at the time he sought*

Finally, I do not urge that *Hill* must be followed forever in this Circuit. Though I should regret it since I agree with the decisions in *Hill* and *Hirst*, I accept the right of a majority of this Court to overrule *Hill* and *Hirst*—but I submit it cannot be overruled by what appears to me to be improper distinctions, but only by an *en banc* court and certainly can only be done if we are to give the decision in *Rodriguez* a different construction than did this Court in *Hill* and *Hirst*. Until *Hill* and *Hirst* are reversed by an *en banc* court, I submit we should follow them. To do otherwise is to create confusion in the law for both litigants and district courts, and to leave the rights of the parties to depend on the panel as constituted. I do not think any member of the Court wants this.

## V

Finally, I submit that the district court erred in finding class discrimination in this case. In the first place, the two named plaintiffs had concededly suffered no injury by a denial of promotion. One had been promoted, the other made no claim of qualification for promotion. The actual injury claimed by both of the plaintiffs was discriminatory discharge, not promotion discrimination. More importantly, the record does not identify a single individual employee who had a valid claim of promotion discrimination. This, however, was not because of any lack of effort to discover one. On June 14, 1977 the district court "entered an order allowing a bifurcated trial wherein the first stage was to determine the liability of the defendant Company, if any, to the plaintiffs and class members." Notices of such action were sent to 466 persons, employees in the classes designated in the certificate, advising them that, if they had suffered any injury within the class certification they would have a claim. The Court then declared that "[t]he following class members presented claims" pursuant to such notice, identifying them. Only one of those filed a claim of promotion discrimination and that one the district court found was, by her own admissions, unqualified for promotion (Janice Orr Mackey). In essence, then, we have here a finding of class discrimination in promotion under a complaint filed by complainants who had admittedly suffered no promotion discrimination and after a trial in which not a single employee with a valid complaint of a promotion discrimination, even though any employee with such a claim had been invited and solicited by the court itself to assert it,

---

*class certification*. In that specific situation the Supreme Court held that the mere fact that subsequent to the denial of class certification the plaintiff's individual claim became moot would not moot his appeal of the denial of class certification—but the Supreme Court made it quite clear that "*[i]f the named plaintiff has no personal stake in the outcome at the time class certification is denied*, relation back of appellate reversal of that denial still would not prevent mootness of the action" (Emphasis added), 445 U.S. 407, n.11, 100 S.Ct. at 1212, n.11. And the Supreme Court repeated at the conclusion of its opinion that "[i]f [on remand] the District Court again denies class certification, and that decision is affirmed, the controversy on the merits will be moot." 445 U.S. at 408, 100 S.Ct. at 1214. As the writer of the Note, *The Personal Stake Requirement in Federal Class Action Litigation*, 33 Baylor L.Rev. 337, 342, put it:

"The Court's decision in *Geraghty* is based upon a division of the personal stake requirement into two distinct categories: (1) the named plaintiff's claim on the merits, and (2) his claim that he is entitled to represent the class. *A personal stake is required for each*" (Emphasis added).

The point of difference between the two cases is that in *Rodriguez* neither at the time of the filing of the action nor at the time of the certification decision had the class representative suffered the same injury as the class he sought to represent and that, by way of contrast, in *Geraghty*, as the Supreme Court repeatedly stated, the plaintiff had sustained the same injury as the class he sought to represent as a class representative both at the time he filed his suit and at the time the district court made its decision on class certification.

*Rodriguez* and *Geraghty* are not thus inconsistent; they are in fact perfectly consistent and I would think it unseemly for us to assume that the Supreme Court was unable to perceive such inconsistency and remove it, if there were any. I can only assume that the Supreme Court found the two decisions consistent and I submit we should accept that decision and not attempt to read into the two decisions an inconsistency which the Supreme Court did not perceive.

came forward to assert such a claim. In the face of that record, how did the district court find class-wide discrimination in promotion?

The bases for the district court's finding are two facts only: 1. The defendant's method of selection was subjective; and 2. The statistical evidence. It would seem that the challenge to the subjective method of promotion would be answered effectively by the failure of the plaintiffs to find one single employee who had been discriminated against in promotion, even though every minority employee in the relevant units had been solicited to file a claim of promotion discrimination.[42] The second circumstance is somewhat odd. The district court simply looks at the over-all employment statistics of the defendant at the relevant facilities, stated in racial terms, and then compares it with the racial distribution of supervisory jobs in those facilities. On that basis, the court found that there was an imbalance in the racial composition, which could only be accounted for by racial discrimination in promotion. I pass over the question whether the record, in which all employees are considered equally qualified for promotion, and turn to the question of whether such statistics, *unsupported by a single identifiable instance of discrimination*, can be deemed to supply a basis for a valid finding of promotion discrimination. I submit it may not.

This is a case, to put it bluntly, where a court has erected a structure of promotion discrimination without absolutely any proof of such discrimination, and, on that basis, has imposed on this defendant a burden of continuous reporting to, and surveillance of its operations by, the district court. I submit, however, that the record in this case, which reveals not one instance of discrimination in promotion, despite the most persistent effort to find one, does not warrant such an imposition either on the defendant or on our limited judicial resources.

CONCLUSION

I submit that both the judgments on the individual claims and on the class claim as granted by the district court should be reversed and set aside and the action dismissed.

---

**42.** *Cf., Knutson v. Boeing Co.*, 655 F.2d 999, 1000–01 (9th Cir. 1981) ("The showing that Boeing used subjective selection criteria will not alone make out a *prima facie* case of disparate impact").